IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

|  |  |
|---|---|
| **Willie Williams**, | |
| Plaintiff, | |
| v. | No. 3:24-CV-00367-BJD-JBT |
|  | **Hon. Joel B. Toomey** |
| **Charles David Ritchey, W. J. Mooneyham, the Estate of D.L. Starling, the Estate of James Geisenburg, the Estate of Bryant Randolph Mickler, and the Consolidated City of Jacksonville,** | **JURY TRIAL DEMANDED** |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Now Comes, Plaintiff WILLIE WILLIAMS, by and through his attorneys, LOEVY & LOEVY and the HUMAN RIGHTS DEFENSE CENTER, and complaining of CHARLES DAVID RITCHEY, W.J. MOONEYHAM, AND THE ESTATES OF D.L. STARLING, LT. BRYANT RANDOLPH MICKLER AND JAMES GEISENBURG, and the CITY OF JACKSONVILLE, alleges as follows:

1.    Willie Williams was wrongly convicted of the 1975 attempted murders and robberies of Kathrina Farah and David Phillips, crimes he

1

had nothing to do with. Mr. Williams spent nearly 45 years, more than half of his life, in prison. He then spent an additional 3 years on parole before finally being exonerated.

2. Mr. Williams had nothing to do with the crimes and has always maintained his innocence.

3. Not one piece of physical evidence ever connected Mr. Williams to the crime.

4. The only evidence against Mr. Williams at his 1976 trial was the testimony of David Phillips, one of the victims. Phillips, who had been shot in the back of the head but survived, testified that he identified Mr. Williams at lineups.

5. However, unbeknownst to Mr. Williams, his counsel, or prosecutors at the time, Mr. Phillips only identified Mr. Williams after being hypnotized by Defendant Mickler.

6. This eyewitness identification evidence was knowingly manipulated by Defendant Charles David Ritchey in conspiracy with Lt. Bryant Mickler and Detectives W.J. Mooneyham, D.L. Starling, and James Geisenburg.

7. Defendants then fabricated police reports claiming,

misleadingly, that Phillips had confidently identified Mr. Williams in photo and live lineups.

8.    Defendants also withheld and destroyed exculpatory evidence, including the fact that Phillips had been hypnotized and an audio recording of the hypnosis session.

9.    The Defendants built an entirely false case against Mr. Williams by fabricating evidence, including the false inculpatory testimony by Phillips and police reports, and suppressing exculpatory evidence that Plaintiff could have used to defend himself in the criminal case against him.

10.    Based on this illegitimate and fabricated evidence, Mr. Williams was convicted of two counts of attempted murder and armed robbery and sentenced to life in prison.

11.    Mr. Williams was finally exonerated in 2024, after the Conviction Integrity Unit discovered that Defendants used hypnosis to obtain Phillips' identification and withheld and destroyed evidence of the hypnosis session.

12.    Mr. Williams brings this suit to vindicate the deprivations of his constitutional rights that caused him to spend nearly 45 years in

3

prison as an innocent man.

## Jurisdiction & Venue

13.     This action is brought pursuant to 42 U.S.C. § 1983 and Florida law to redress Defendants' tortious conduct and their deprivations of Mr. Williams's rights secured by the U.S. Constitution.

14.     This Court has jurisdiction of Mr. Williams's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state-law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper under 28 U.S.C. § 1391(b). The events and omissions giving rise to Mr. William's claims occurred within this judicial district, including the investigation, prosecution, and trial resulting in Mr. Williams's conviction.

16.     On April 16, 2024, Mr. Williams submitted notice of his claims against the Consolidated City of Jacksonville pursuant to Florida Statute § 768.28. His claim was denied on June 24, 2024.

## Parties

17.     Plaintiff Willie Williams spent nearly 45 years incarcerated for a crime he did not commit.

18.     At all times relevant to the events described in this

4

Complaint, Defendants Charles David Ritchey, W.J. Mooneyham, and now-deceased D.L. Starling, Lt. Bryant Randolph Mickler and James Geisenburg were detectives in the Jacksonville Sheriff's Office ("JSO"). For purposes of this Complaint, Charles David Ritchey, W.J. Mooneyham, D.L. Starling, James Geisenburg, and Bryant Randolph Mickler are collectively referred to as "Officer Defendants."

19.    D.L. Starling, Lt. Bryant Randolph Mickler, and James Geisenburg died before this Complaint was filed. The Estate of D.L. Starling is sued as successor in interest to D.L. Starling. The Estate of Bryant Randolph Mickler is sued as successor in interest to Bryant Randolph Mickler. The Estate of James Geisenburg is sued as successor in interest to James Geisenburg.

20.    Defendant Consolidated City of Jacksonville ("Defendant City') is a consolidated municipal corporation that combines the City of Jacksonville, Duval County, and other smaller municipal districts into a single political entity. Defendant City's jurisdiction extends throughout Duval County.[1]  Defendant City is or was the employer of Charles David

---

[1]Defendant City's jurisdiction does not however, extend to Jacksonville Beach, Atlantic Beach, and Neptune Beach or the Town of Baldwin.

Ritchey, W.J. Mooneyham, D.L. Starling, James Geisenburg, and Bryant Randolph Mickler.

21.     Each of the Defendants named in this Complaint acted during their investigation of the crimes as agents or employees of Defendant City.

22.     Defendant City is liable for all torts committed by the Officer Defendants pursuant to the doctrine of respondeat superior.

23.     Lawsuits against any of the entities that are a part of the Consolidated City of Jacksonville, including Duval County, are effectively against Defendant City. As such, Defendant City is liable for any resulting judgement.

24.     Additionally, Defendant City is responsible for the policies and practices of the Jacksonville Sheriff's Office and is liable for the violations of Mr. Williams's rights caused by the unconstitutional policies and customs of the Jacksonville Sheriff's Office, including actions of the above-named Defendants employed by Defendant City undertaken pursuant to those policies and customs during the investigation.

25.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his employment at all

times relevant to this lawsuit. Each of the individual Defendants is sued in his individual capacity unless otherwise noted.

## The Crimes and Police Chase

26.   On October 8, 1975, Alfred Mitchell walked into Wesconnett Produce Store and shot Kathrina Farah and David Phillips three times each after demanding they give him their money.

27.   Meanwhile, Mr. Williams was outside in the passenger seat of his green Buick waiting for Mitchell. Mr. Williams did not know that Mitchell had gone into the store with the intention of robbing it or committing any act of violence.

28.   Upon exiting the store, Mitchell put an item under the seat of Mr. Williams's car, jumped into the driver's seat, and sped away from the scene. In his rush to get away, Mitchell hit another parked car.

29.   Police officers from the Jacksonville Sheriff's Office responded and began chasing the Buick almost immediately.

30.   During the chase, Mr. Williams asked Mitchell what happened in the store and why they were being chased by police. Mitchell responded with words to the effect of, "I just killed two people. Don't you be the third one."

31.     Mr. Williams managed to escape the car after Mitchell ran into another parked vehicle. Terrified, he tried to jump over a nearby fence to distance himself from Mitchell and the chase.

32.     Mr. Williams was apprehended without resistance by police and taken to the Jacksonville Sheriff's Office for questioning.

33.     Mitchell kept driving for a short time after Mr. Williams's escape before he stopped the vehicle and fled into a nearby house. Once inside, Mitchell shot himself in the head. He died immediately.

34.     Fortunately, Farah and Mitchell survived their wounds and were taken to the hospital for treatment.

## Defendant's Initial Investigation

35.     In the immediate aftermath of the crimes, it became clear that Alfred Mitchell was solely responsible for shooting Farah and Phillips.

36.     Defendants Ritchey and Mooneyham were partners and the lead detectives on the case.

37.     The day of the crime Defendants Ritchey and Mooneyham first interviewed the man who had reported the green Buick to the police, Robert West.

38.     West, who worked in an office 100-150 feet away from

Wesconnett Produce Store, provided a detailed account to Defendants. He stated that he saw two Black men in a green Buick stop in front of his office window. The driver of the car left the car in a red, white, and blue striped shirt and walked into the grocery store, while the other man remained in the car. Several minutes later, the same man walked out of the grocery store. He walked over to the driver's seat and placed an object under the front seat. The driver then sped away, hitting a car in the process. West immediately contacted the Jacksonville Sheriff's Office to report what he saw.

39.     Ritchey and Mooneyham also spoke to the officers involved in the car chase.

40.     Jacksonville Sheriff's Officers C.H. Ray and Parker responded to the police pursuit of the green Buick in their helicopter. They observed a young Black man wearing no shirt and striped pants jump out of the passenger side of the car when the Buick hit a parked truck. Officer Ray then observed the Buick continue to drive for a few blocks before hitting a curb and stopping. Another young Black man then ran out of the car into a house.

41.     Motorcycle officers Bready and Geuterman confirmed that

they chased the passenger of the Buick – Mr. Williams – and apprehended him.

42.    Officers Royal and Gueterman confirmed that they chased the driver of the Buick – Alfred Mitchell – to a nearby house where they found him dead from a gunshot to the head.

43.    At the house, Officer Royal collected the black revolver Mitchell used to shoot himself. He also collected a chrome revolver from underneath the driver's seat of the Buick, Phillips' wallet, and two shirts (one striped and one that was black or dark blue with flowers on it) from the car.

44.    The revolvers recovered from the scene were sent to Donald Champagne for firearms analysis. Champagne found that the Black revolver was the gun Mitchell used to kill himself, while the chrome revolver was the gun used to shoot Farah and Phillips. He also found that the chrome gun had fired bullets in a murder and robbery that had taken place two weeks before.

45.    Defendants Ritchey and Mooneyham also attempted to speak to the victims while they were recovering.

46.    Farah, whose eyesight had been severely injured by the shot

to her head, described the shooter as a Black man wearing a red, white, and blue striped shirt.

47.    Phillips was unable to provide any specific identifying information about the shooter other than that he was a Black man in a striped shirt carrying a chrome plated pistol.

48.    Though vague, the victims' initial descriptions of their shooter matched the description of the driver of the Buick that West gave to Defendants Ritchey and Mooneyham.

## The Palm Furniture Murder

49.    About two weeks prior to the shootings at Wesconnett Produce, another man was found dead from a shot to the head at Palm Furniture Company in Jacksonville.

50.    Defendant Starling was the lead investigator of the Palm Furniture Murder. He and Defendant Ritchey directed Champagne to analyze the revolvers recovered from Wesconnett Produce shootings with the bullets found during the Palm Furniture Investigation. Champagne confirmed that the chrome gun used in the Palm Furniture Murder was the same one used to shoot Phillips.

51.    Defendant Starling also interviewed Deborah Mitchell, Alfred

Mitchell's sister-in-law, during his investigation into the Palm Furniture Murder. She stated that Alfred told her that he killed a man inside of the Palm Furniture Company store and that he would kill himself before he went back to jail.

52.   Based on Champagne's ballistics analysis and Mitchell's confession to Deborah Mitchell, Defendant Starling concluded that Mitchell solely robbed and murdered the victim of the Palm Furniture Murder. Starling exceptionally cleared the case because Mitchell had committed suicide.

## Defendants Decide to Frame Mr. Williams

53.   Though it was clear from Defendants' initial investigation that Mitchell was also the sole person responsible for the attempted murder and robbery of Farah and Phillips, Defendants nevertheless focused their efforts on pinning the crimes on Plaintiff. In order to do so they acted in concert to develop false evidence of Mr. Williams as the shooter.

54.   The evening of the crime, police officers, including Defendants Gesisenburg, Ritchey, and Mooneyham, interrogated Mr. Williams.

55.   Defendant Geisenburg was the first officer to speak to Mr.

Williams at the Sheriff's Office. Geisenburg already knew Mr. Williams and had a friendly relationship with him because he had worked with him on a prior investigation and knew him to be reliable. Mr. Williams told Geisenburg he did not understand why he was under arrest and the Defendants had the wrong man. Mr. Williams explained how he believed Mitchell went into Wesconnett Produce Store to cash a check. While he was waiting, Mr. Williams got hot and took off the blue shirt he was wearing that day.

56.    Mr. Williams did not know that Mitchell shot and robbed Farah and Phillips until Mitchell threatened to shoot him as well.

57.    Plaintiff then spoke to Defendants Ritchey and Mooneyham and told them the same information that he had already provided to Defendant Geisenburg. Mr. Williams also provided a written statement consistent with his oral statement to Defendant Geisenburg.

58.    Mr. Williams' signed statement was consistent with the Defendants' investigation and what the other eyewitnesses had stated occurred as well.

59.    Despite Mr. Williams' statements to Defendant Officers, eyewitness accounts that confirmed that Mitchell was the sole

perpetrator of the crimes, and that Mr. Williams had provided reliable information to JSO in the past, Defendants Ritchey and Mooneyham, agreed with the other Defendant Officers to pin the crimes on Plaintiff.

60.    Knowing that Farah's eyesight had been permanently damaged by the shooting, the Defendant Officers focused their efforts on getting an identification of Mr. Williams as the perpetrator from Phillips.

61.    A day or two after Phillips told defendants he didn't remember anything, Defendant Ritchey visited Phillips again in the hospital and showed him a photo array of ten pictures, including photos of Mitchell and Mr. Williams.

62.    Phillips could not make an identification. He told the Defendants again that he could not remember anything about the robbery after being shot.

63.    After Phillips was released from the hospital, Defendant Ritchey asked him to come to the Robbery Office of the JSO to view a photo line-up again.

64.    When Phillips arrived at the Robbery Office Defendants Ritchey, Wickler, Mooneyham, and Starling were waiting for him.

65.    Defendant Mickler then hypnotized Phillips to "help" him

remember more details about the robbery.

66.    On information and belief, Defendants knew that hypnosis was not a reliable investigatory technique. Moreover, Phillips had told Defendants on two prior occasions he had no memory of the events after being shot, nor could he identify the perpetrator from the photo arrays Defendants showed him.

67.    Defendants Ritchey, Wickler, Mooneyham, and Starling memorialized the hypnosis through, among other things, an audio recording.

68.    After the hypnosis, Defendant Ritchey showed Phillips the same ten photos again. This time, Phillips chose Mr. Williams' picture.

69.    On information and belief, Defendant Officers knew that the post-hypnosis identification by Phillips of Mr. Williams was false and fabricated.

70.    But for Defendant Officers' improperly suggestive tactics and steering, Phillips would not have identified Mr. Williams, who Phillips had not seen commit any crime.

71.    Two days after the hypnosis session and photo line-up identification, Defendants Officers asked Phillips to return to the

Robbery Office to view an in-person line-up.

72.     In the presence of Defendants Ritchey, and other unknown JSO officers, Phillips identified Mr. Williams again. Phillips would not have made this false identification but for the misconduct described above.

73.     On information and belief, Defendants Officers agreed to destroy the audio recording and any notes of Defendant Mickler's hypnosis session with Phillips to ensure Mr. Williams's conviction.

74.      On information and belief, the audio recording and any notes of the session no longer exist.

**Williams Is Tried and Convicted Based on Fabricated Evidence**

75.     Between 1975 and 1976, as the result of Defendants' misconduct and based solely on Defendants' fabricated evidence described in this Complaint, Mr. Williams was prosecuted and convicted of the attempted murders of Ms. Farah and Mr. Phillips.

76.     At trial, Plaintiff testified in his own defense and maintained his innocence.

77.     Robert West also testified and provided his detailed account of witnessing Mitchell go into the store by himself in a red, white, and

blue striped shirt. He also made an in-court identification of Alfred Mitchell. West further testified unequivocally that Mr. Williams was not the man who he saw walk into Wesconnett Produce Store.

78.    The only evidence suggesting that Mr. Williams was the shooter was Mr. Phillips' manipulated identification and subsequent in court identification and testimony.

79.    The Defendants' fabrication of evidence was not disclosed to prosecutors, Mr. Williams, or his criminal defense attorneys in advance of his criminal trial.

80.    The Defendants also wrote false police reports and gave false statements before trial, which were the basis for charging and prosecuting Mr. Williams.

81.    At all times, the Defendants suppressed the true circumstances surrounding Phillips' identification of Plaintiff.

82.    In addition, on information and belief, the Defendants suppressed and destroyed additional evidence, including a recording of Phillips' hypnosis session, police reports and notes detailing the hypnosis session, and other evidence still unknown to Mr. Williams, which would also have shown his innocence.

83.    Mr. Williams maintained his innocence from the moment he was arrested.

84.    However, because of the Defendants' false and manufactured evidence and destruction of exculpatory and impeachment evidence, Mr. Williams was wrongly convicted.

### Plaintiff's Damages

85.    When Mr. Williams was arrested and charged with the attempted murders of Ms. Farah and Mr. Phillips, he was 31 years old.

86.    Mr. Williams was convicted on February 16, 1976.

87.    Upon his conviction, Mr. Williams was sentenced to life in prison for crimes he did not commit.

88.    In total, Mr. Williams spent almost 45 years in prison as an innocent man.

89.    Mr. Williams was taken away from, and missed out on, the lives of his family and friends. He missed special occasions and milestones, and he returned home to relationships changed by or lost to over four decades of wrongful incarceration. During his incarceration, he also lost several family members including his mother, father, sister, wife three aunts, and two nephews and was denied the chance to attend their

funeral services.

90.    Mr. Williams was robbed of his prime adult years and over half of his life. He was deprived of opportunities to raise a family, engage in meaningful labor, develop a career, and pursue his interests and passions. Mr. Williams has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

91.    During his nearly 45 years of wrongful imprisonment, Mr. Williams was detained in harsh and dangerous conditions in maximum security prisons, including time spent in solitary confinement and witnessing several instances of violence against other prisoners.

92.    Throughout his time in prison, Mr. Williams also was forced to work without pay or other privileges. At times, he undertook this compelled labor at serious risk to his health and safety. For example, at the beginning of his sentence, Mr. Williams was assigned to a chain-gang for six months. During that time, he worked in roadside ditches, fully shackled. The ditches were also teeming with wild snakes, which Mr. Williams had to take care to avoid on top of the already heavy manual labor he was forced to complete. Armed guards would also shoot at these

snakes, which added yet another element of physical danger and psychological distress.  In another example, Mr. Williams was forced to work at the prison infirmary where he regularly cleaned up blood and other biohazards without being provided any personal protective equipment by the prison. As a result of the exposure to infected blood and lack of PPE, Mr. Williams suffered injuries.

93.    In all that time, Mr. Williams never knew whether the truth would come out or whether he would ever be exonerated.

94.    In addition to the severe trauma of wrongful imprisonment and Mr. Williams's loss of liberty, the Defendants' misconduct continues to cause him extreme psychological and emotional pain and suffering.

95.    Mr. Williams was released on early parole on June 30, 2020. In the nearly four years preceding his exoneration, Mr. Williams had to face a community that still believed he was capable of attempted murder.

## Mr. Williams's Exoneration

96.    Mr. Williams fought hard to prove his innocence for almost half a century of wrongful imprisonment.

97.    In 2005, Mr. Williams filed a motion for post-conviction DNA testing, asking for the clothing worn by Mitchell and Williams to be

20

tested for the victims' blood to identify the shooter. The Court granted the motion and ordered testing on two shirts, including the red, white, and blue striped shirt, and a pair of Williams' pants. In 2006, the FDLE reported that their analysis failed to find blood on any of the clothing items.

98.     On June 30, 2020, when he was 75 years old, Mr. Williams was released on early parole.

99.     In 2021, the Conviction Integrity Review Division of the Fourth Judicial Circuit State Attorney's Office ("CIR") decided to review Mr. Williams' case. The CIR conducted a full re-examination of his case, including DNA testing and interviewing witnesses.

100.    During their review, the CIR discovered previously undisclosed evidence that Defendant Officers used hypnosis to obtain Phillips's identification of Mr. Williams.

101.    CIR interviewed Defendant Ritchey about the circumstances surrounding Phillips' identification of Mr. Williams as Phillips was the only person to identify Mr. Williams. Defendant Ritchey, who remembered the case well, admitted to the CIR that Defendant Mickler hypnotized Phillips prior to his identification of Mr. Williams from a

photo line-up.

102.   Defendant Ritchey told the CIR investigators that the hypnosis sessions had been audio recorded, but the CIR was unable to locate the recording.

103.   Phillips, likewise, confirmed to the CIR that he was hypnotized prior to identifying Williams.

104.   On May 16, 2023, the CIR disclosed to Mr. Williams that hypnosis was used in his case. This was the first time any such information was disclosed to Mr. Williams, his counsel, or the prosecution.

105.   On October 19, 2023, Williams filed a petition seeking to vacate his convictions based on the suppressed evidence of Defendant Mickler's hypnosis of Phillips.

106.   On January 3, 2024, the CIR joined Mr. Williams' counsel in requesting that the petition be granted.

107.   That day, the court granted the motion and vacated Mr. Williams's convictions, and the prosecution dismissed all charges against him.

108.   Mr. Williams has spent over half his life wrongfully

incarcerated. For the first time in over 48 years, Mr. Williams can finally pursue the rest of his life as a free man. Mr. Williams brings this suit to vindicate the deprivations of his rights that caused his wrongful detention, prosecution, and incarceration.

## The Jacksonville Sheriff's Office's Policies, Practices, and Customs

109. The actions of Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler as described herein were consistent with the policies, practices, and customs of the Defendant City.

110. The actions of Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler described herein were undertaken pursuant to the policies and practices of Defendant City and the Jacksonville Sheriff's Office, in that Jacksonville Sheriff's Office officers regularly used unconstitutional measures during the relevant time periods to falsely implicate criminal suspects, including by withholding or suppressing exculpatory evidence, fabricating evidence, feeding information to or manipulating witnesses, and engaging in unduly suggestive identification and lineup procedures. These were widespread, clear, and persistent patterns and practices of officers in the Jacksonville

Sheriff's Office in the years around, prior to, and leading up to Plaintiff's 1976 conviction.

111.  At all times relevant herein, the Defendant City and the Jacksonville Sheriff's Office had no policies or inadequate policies, procedures, rules, or regulations relating to police officers' obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory or impeachment evidence, or any such policies were woefully inadequate. The City of Jacksonville and the Jacksonville Sheriff's Office deliberately chose not to adopt any or adequate policies on officers' obligations to disclose exculpatory and impeachment evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), even though the need for such policies was obvious and the likelihood of recurring violations clear.

112.  At all times relevant herein, Defendant City and the Jacksonville Sheriff's Office had no policies or inadequate policies, procedures, rules, or regulations regarding the conduct of lineups, or the writing of police reports. The City of Jacksonville and the Jacksonville Sheriff's Office deliberately chose not to adopt any or adequate policies regarding the conduct of lineups, and the writing of police reports even though the need for such policies was obvious and the likelihood of

recurring violations clear.

113.   The failure to maintain adequate policies on these topics posed an obvious risk of violation of the constitutional rights of Mr. Williams and other criminal defendants. This failure to maintain adequate policies therefore constituted deliberate indifference on the part of Defendant City.

114.   At all times relevant herein and for a period of time prior thereto, the City of Jacksonville had notice of a widespread practice by their officers under which individuals suspected of criminal activity, such as Mr. Wiliams, were routinely deprived of exculpatory evidence, were subjected to criminal proceedings based on false evidence, and/or were deprived of their liberty without probable cause, such that individuals were routinely implicated in crimes to which they had no connection and for which there was scant evidence to suggest that they were involved.

115.   Upon information and belief, the final policymakers for the Defendant City and the Jacksonville Sheriff's Office were on notice before 1975-76 that their policies were inadequate and outdated, likely to lead to constitutional violations by police officers, and needed to be revised to ensure that officers complied with the law.

116.   The widespread practices were so well-settled as to constitute de facto policy in the Jacksonville Sheriff's Office and they were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problems, thereby effectively ratifying them.

117.   In addition, at all times relevant herein, Defendant City and the Jacksonville Sheriff's Office did not provide any or adequate training or supervision to Jacksonville Sheriff's Office police officers with respect to their obligation to disclose exculpatory and impeachment evidence, the conduct of lineups or identification procedures, or writing of police reports and notes on witness statements.

118.   The importance of and need for training was known to final policymakers of Defendant City in and prior to 1975.

119.   Upon information and belief, at all times relevant herein, final policymakers knew of these problems, allowed them to continue, and made decisions not to implement adequate training or supervision.

120.   The constitutional violations complained of by Plaintiff were a highly predictable consequence of a failure to equip the Jacksonville Sheriff's Office police officers with the specific tools—including policies,

training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory or impeachment evidence, how to conduct lineups, and how to write police reports or notes of witness statements. Defendant City made a conscious choice not to properly train, supervise, or discipline its officers or provide adequate policies on these issues.

121.  Defendant City and the Jacksonville Sheriff's Office decided not to implement any legitimate mechanism for oversight or punishment of officers who violated their *Brady* obligations or citizens' constitutional rights, or who fabricated evidence or manipulated witnesses or created unduly suggestive lineups, thereby leading officers to believe that they could violate citizens' constitutional rights with impunity.

122.  The policies and practices of Defendant City and the Jacksonville Sheriff's Office were the moving force behind the violation of Mr. Williams's rights. The widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of Defendant City directly encouraged and were thereby the moving force behind the very type of actions at issue by failing to adequately train, supervise, and discipline their officers who withheld exculpatory evidence, fabricated

false evidence and witness testimony, and pursued wrongful prosecutions and convictions.

123.  Final policymakers for Defendant City on matters relating to the respective police departments knew, among other things, that there was a need to train and supervise police officers and that the their existing policies were outdated and needed to be updated to include policies on how to handle, preserve, and disclose exculpatory and impeachment evidence, how to conduct lineups or other identification procedures, and how to write police reports or notes of witness statements.

124.  The deficient policies and practices described herein caused other criminal defendants to be wrongfully convicted, putting policymakers on notice of the problem.

125.  Defendant City is liable because the violation of Plaintiff's rights as described in this Complaint were caused by the policies, practices, customs, and/or actions of final policymakers for Defendant City.

126.  As a direct and proximate result of Defendants' actions, Plaintiff's constitutional rights were violated and he suffered injuries and

damages, including loss of liberty, physical sickness and injury, emotional pain and suffering, and other grievous and continuing injuries as set forth herein.

## Count 1
## 42 U.S.C. § 1983 – Due Process
## (Fourteenth Amendment)

127.  Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated herein.

128.  As set forth in the paragraphs above, Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mr. Williams of his constitutional right to due process and his right to a fair trial.

129.  In the manner described more fully above, the Defendants fabricated evidence, including a false identification obtained through hypnosis and other evidence falsely implicating Mr. Williams in the crime, obtained charges against Mr. Williams, secured his conviction using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Mr. Williams during his

criminal case.

130.   The Defendants also deliberately withheld exculpatory evidence from prosecutors, Mr. Williams, and Mr. Williams's criminal defense attorneys, including: evidence relating to the Defendants' fabrication of Mr. Phillips manipulated identification; an audio recording of the hypnosis; and the fact that Defendants falsified police reports, thereby misleading and misdirecting the criminal prosecution of Mr. Williams.

131.   Upon information and belief, Defendants also destroyed key exculpatory and impeachment evidence including an audio recording of Defendant Mickler's hypnosis session with Phillips.

132.   In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Mr. Williams.

133.   The Defendants' misconduct described in this count resulted in the unjust and wrongful criminal prosecution and conviction of Mr. Williams and the deprivation of his liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mr. Willaims

could not have, and would not have, been pursued.

134.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. Williams's innocence.

135.  As a result of Defendants' misconduct described in this count, Mr. Williams suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above in the above paragraphs.

136.  The misconduct described in this count was undertaken pursuant to the policies and practices of Defendant City in the manner more fully described below in Count 5.

## Count 2
### 42 U.S.C. § 1983 – Illegal Detention and Prosecution
### (Fourth and Fourteenth Amendments)

137.  Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated herein.

138.  As set forth in the above paragraphs, Defendants Ritchey, Mooneyham, Starling, Geisenburg,  and Mickler, individually, jointly,

and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. Williams of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Williams without any probable cause for doing so and in spite of the fact that they knew Mr. Williams was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

139.   In doing so, the Defendants caused Mr. Williams to be deprived of his liberty without probable cause, detained without probable cause, and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

140.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. Williams's innocence.

141.   As a result of Defendants' misconduct described in this count, Mr. Williams suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and

involuntary prison labor, and other grievous and continuing injuries and damages as set forth in the above paragraphs.

142.   The misconduct described in this count was undertaken pursuant to the policies and practices of Defendant City in the manner more fully described below in Count 5.

## Count 3
## 42 U.S.C. § 1983 – Failure to Intervene

143.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated herein.

144.   As set forth in the above paragraphs, Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler, during the constitutional violations described in this Complaint, stood by without intervening to prevent the violation of Mr. Williams's constitutional rights, even though they had the duty and the opportunity to do so.

145.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. Williams's innocence.

146.   As a result of Defendants' failure to intervene to prevent the violations of Mr. Williams's constitutional rights, Mr. Williams suffered

loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth the above paragraphs.

147.   The misconduct described in this count was undertaken pursuant to the policies and practices of Defendant City, in the manner more fully described below in Count 5.

### Count 4
### 42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights

148.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated herein.

149.   As set forth in the above paragraphs, Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Williams for the attempted murders of Farah and Phillips, regardless of Mr. Williams's guilt or innocence, and thereby to deprive him of his constitutional rights.

150.   In so doing, the Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

151. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Williams of his rights.

152. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

153. As a result of the Defendants' agreement, Mr. Williams suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth in the above paragraphs.

154. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and/or in total disregard of the truth and of Mr. Williams's innocence.

155. The misconduct described in this count was undertaken pursuant to the policies and practices of Defendant City in the manner more fully described below in Count 5.

**Count 5**
**42 U.S.C. § 1983 – Policy & Custom Claims Against the City of Jacksonville**

156.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated herein.

157.   As described above, Defendant City is liable for the violation of Mr. Williams's constitutional rights by virtue of its official policies.

158.   Mr. Williams's injuries were caused by the express or official policies, absence of necessary express policies, and widespread practices and customs of Defendant City, as well as by the actions of policymaking officials for Defendant City.

159.   At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, Defendant City failed to promulgate any or adequate rules, regulations, policies or procedures on: the handling, preservation, and disclosure of exculpatory evidence; the writing of police reports and notes of witness statements; the conduct of lineups and identification procedures; and meaningful discipline of officers accused of such unlawful conduct.

160.   In addition, or in the alternative, Defendant City failed to train, supervise, or discipline officers of their respective police

departments, on the above topics. Defendant City chose not to implement any or adequate policies and training in these areas even though the need for such policies and training was obvious, and the failure to do so would lead to violations of constitutional rights. The decision not to implement any or adequate policies or training in these areas also contributed to the widespread practices described in this Complaint.

161. The failure to promulgate proper or adequate rules, regulations, policies, procedures and training was committed by final policymakers or those delegated final policymaking authority.

162. At all times relevant herein, final policymakers for Defendant City knew of these problems and allowed them to continue, and made decisions not to implement adequate policies, training, supervision, or discipline.

163. The constitutional violations complained of by Mr. Williams were a highly predictable consequence of a failure to equip Jacksonville Sheriff's Office officers with the specific tools—including policies, training, and supervision—to handle the recurring situations of how to handle, preserve, and disclose exculpatory evidence; how to conduct proper identification procedures, including lineups; and how to write

police reports and notes of witness statements.

164.   The policies, practices, and customs set forth above were maintained and implemented with deliberate indifference. They were the moving force behind the constitutional violations described above and directly and proximately caused Mr. Williams to suffer the grievous and permanent injuries and damages set forth above.

### Count 6
### State Law Claim – Malicious Prosecution

165.   Plaintiff incorporates paragraphs 26-126 as if fully restated here.

166.   In the manner described above, Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Mr. Williams of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mr. Williams without any probable cause for doing so.

167.   In so doing, the Defendants caused Mr. Williams to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and/or

continued maliciously, resulting in injury.

168.   The judicial proceedings terminated in Mr. Williams's favor and in a manner indicative of his innocence when his conviction was vacated and/or all charges against him were dropped. This constituted a bona fide termination of the proceedings.

169.   The misconduct described in this count was undertaken with reckless indifference to the rights of others and/or in total disregard of the truth and of Mr. Williams's innocence.

170.   As a result of the Defendants' agreement, Mr. Williams suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## Court 7
## State Law Claim – Intentional Infliction of Emotional Distress

171.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated here.

172.   The actions, omissions, and conduct of Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler, as set forth above were extreme and outrageous. These actions were rooted in an abuse of power

and authority and were undertaken with the intent to cause, and/or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Mr. Williams, as is more fully alleged above.

173.   Defendants' misconduct in deliberately fabricating evidence and suppressing exculpatory evidence in order to secure Mr. Williams's wrongful murder conviction goes beyond all possible bounds of decency and is atrocious and intolerable.

174.   As a result of the Defendants' misconduct described in this count, Mr. Williams experienced severe suffering, including loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count 8
## State Law Claim – Negligent Hiring, Supervision, and Retention

175.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated here.

176.   As alleged more fully above in Count 5, Defendant City had notice of widespread practices and customs within the Jacksonville Sheriff's Office whereby law enforcement officers, including the

Defendant Officers, routinely (1) fabricated evidence and reports relating to evidence; (2) failed to maintain and/or preserve evidence and/or destroyed evidence; and (3) failed to disclose exculpatory evidence during criminal trials.

177. As alleged above in Count 5, Defendant City failed to adequately train or discipline officers in the Jacksonville Sheriff's Office, including Defendant Officers, regarding the use of forensic scientific methods during criminal investigations, including but not limited to the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence, and impeachment evidence; the writing of police reports taking of investigative notes; and the maintenance of investigative files and the disclosure of files in criminal proceedings.

178. Defendant City, acting through its agents and policymakers, knew or should have known that the Defendant Officers were unfit and incompetent at conducting criminal investigations.

179. At all times relevant to this complaint, Defendant City failed to adequately supervise its employees engaged in criminal investigations, which permitted those employees, including the individual Defendants,

41

to engage in misconduct.

180.   As a result of the Defendant Officers' misconduct described in this count, Mr. Williams experienced severe suffering, including loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## Count 9
## State Law Claim – Civil Conspiracy

181.   Plaintiff incorporates paragraph 26-126 of this Complaint as if fully restated here.

182.   As described more fully above, Defendants Ritchey, Mooneyham, Starling, Geisenburg, and Mickler, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mr. Williams for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Mr. Williams of his rights.

183.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful

participants in joint activity.

184.   The Defendant Officers' acts of misconduct detailed in this complaint were overt acts undertaken in pursuance of the conspiracy.

185.   The violations of law described in this Complaint were accomplished by the Defendant Officers' conspiracy.

186.   The misconduct described in this count was objectively unreasonable and was undertaken with reckless indifference.

187.   As a result of the Defendants' agreement, Mr. Williams suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, forced and involuntary prison labor, and other grievous and continuing injuries and damages as set forth above.

## Count 10
## State Law Claim – Respondeat Superior

188.   Plaintiff incorporates paragraphs 26-126 of this Complaint as if fully restated here.

189.   While committing the misconduct alleged in this Complaint, the Defendant Officers were employees, members, and agents of the Consolidated City of Jacksonville, acting at all relevant times within the

scope of their employment.

190.   Defendant City is liable as principal for all torts committed by its agents.

## Count 11
## State Law Claim – Indemnification

191.   Plaintiff incorporates paragraphs 26-1 of this Complaint as if fully restated here.

192.   Defendant City is obligated under law to pay any tort judgment against its employees or agents.

193.   Defendant Officers were employees, members, and agents of the Consolidated City of Jacksonville, acting at all relevant times within the scope of their employment in committing the misconduct described in this Complaint.

194.   The Consolidated City of Jacksonville is responsible to pay any judgment entered against Defendant Officers. Mr. Williams therefore demands judgment against Defendant City, in the amounts awarded to Mr. Williams against the Defendant Officers as damages, attorneys' fees, costs, and interest.

WHEREFORE, Plaintiff WILLIE WILLIAMS respectfully requests that this Court enter a judgment in his favor and against Defendants

City of Jacksonville, Ritchey, Mooneyham, Starling, Geisenburg, and Mickler; awarding compensatory damages, attorneys' fees, and costs against each Defendant; awarding punitive damages against each of the individual Defendants; and any other relief that this Court deems just and appropriate.

**Demand for a Jury Trial**

Plaintiff WILLIE WILLIAMS hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

                                          **Willie Williams**

                                          By:/s/ Lauren Carbajal
                                          *One of Williams's Attorneys*

Jon Loevy*                               Joshua Martin, Fl. #1040927
Lauren Carbajal* CA #336485              EJ Hurst, NC #39261 (Pro Hac Vice
LOEVY & LOEVY                            Pending)
311 N. Aberdeen St.                      Human Rights Defense Center
Chicago, IL 60607                        P.O. Box 1151
Telephone: (312) 243-5900                Lake Worth, FL 33460
jon@loevy.com                            Telephone: (802) 233-2545
carbajal@loevy.com                       jmartin@humanrightsdefensecenter.or
                                         g

***Attorneys for Plaintiff***
*\*Admitted Pro Hac Vice*                 ***Attorneys for Plaintiff***