**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

| | | |
|---|---|---|
| WILLIE WILLIAMS, *Plaintiff,* | **)** **)** **)** | |
| *vs.* | **)** **)** **)** | Case No: 3:24-cv-00367-BJD-JBT Judge Brian J. Davis Mag. Judge Samuel J. Horovitz |
| CHARLES DAVID RITCHEY, *et al.,* *Defendants.* | **)** **)** **)** **)** | |

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Willie Williams spent nearly 45 years in prison after Defendants framed him for a shooting he did not commit. Defendants obtained Plaintiff's wrongful conviction by fabricating false evidence against him, suppressing *Brady* evidence, and destroying other exculpatory evidence. Defendants covered up their misconduct for 45 years, until the State Attorney's Office reviewed Plaintiff's criminal case and found that *Brady* evidence had been suppressed. Plaintiff's conviction was vacated in 2024 after this misconduct came to light.

Defendants recognize that a jury will decide at least some of the claims in this civil case. Defendants did not move for summary judgment on Plaintiff's fabrication of evidence or destruction of evidence claims. Defendants also do not dispute that they suppressed an exculpatory handwritten note documenting that Alfred Mitchell,

not Plaintiff, wore the red, white, and blue striped shirt that victims and eyewitnesses reported the shooter wearing on the day of the crime.

The few claims on which Defendants seek summary judgment should also go to trial because material facts remain in dispute. Most prominently, there is conflicting evidence as to whether the Defendant Officers disclosed to the prosecutor that the only identification of Plaintiff as the shooter—the *only* direct evidence implicating Plaintiff as the shooter—was caused by hypnosis. Ralph Greene, the prosecutor, denied any knowledge of that fact. But Defendants refuse to credit his testimony, in contravention of the summary judgment standard.

Defendants' refusal to abide by the standard for summary judgment precludes the relief sought in their motion. A jury must decide which of the competing versions of events is true. After Defendants deprived Plaintiff of a fair trial in 1976, they cannot escape liability again by covering up factual disputes that exist in the record. Defendants' motions for summary judgment should be denied, and the claims raised in those motions—along with the claims on which Defendants did not seek summary judgment—should go to trial.

## FACTUAL BACKGROUND

In 1975, Alfred Mitchell used Willie Williams' car to drive to the Wesconnett Produce store and commit an armed robbery in which two people were shot. Dkt.

104-21 at 4–8; Dkt. 104-1 at 58:22–84:15.[1] Williams had no idea that Mitchell planned to commit the robbery; he did not even know it happened until Mitchell began fleeing from police in a high-speed chase. Dkt. 104-1 at 82:08–84:21. But Mitchell killed himself at the end of the police chase, leaving Williams as only living person who could be convicted for the crime. Dkt. 104-21 at 3. Multiple witnesses viewed photo arrays and ruled out Plaintiff as the shooter. Dkt. 104-19 at 5, 8–10. Not until after Defendant Mickler performed hypnosis on one of the victims, David Phillips, did Phillips identify Plaintiff as the shooter. Dkt. 104-21 at 8–12. Phillips was the only person who ever identified Plaintiff as the shooter. *Id.* at 11. The fact that hypnosis was performed on Phillips was not disclosed to the prosecutor or Williams' defense counsel. Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08; Dkt. 104-36 at 21:09–22.

## I.    The Wesconnett Produce Shooting and Events Leading Up to It

In the afternoon of October 8, 1975, Alfred Mitchell saw his brother's friend, Vernon McPhadden, outside the Rite-Way Cleaners on Florida Avenue. Dkt. 115-1 at 12:01–14, 25:05–13. Mitchell asked McPhadden for a ride across town. *Id.* at 10:08–15, 12:01–14, 13:21–14:03. They had no plans to go across town together; Mitchell just walked up and asked him. *Id.* at 14:04–11. McPhadden said no. *Id.* at

---

[1] All citations to page numbers of court-filed records refer to the blue CM/ECF-stamped number at the top of the document. Additionally, Plaintiff's counsel cited to exhibits already filed by Defendants' counsel where possible.

12:01–10. Mitchell hung around a while longer until, by chance, Willie Williams drove up and stopped at the service station across the street. *Id.* at 15:14–17:02; Dkt. 115-6 at 34–35. Williams was giving his friend Louis Ross a ride downtown. Dkt. 115-6 at 33–35; Dkt. 104-1 at 55:24–56:09, 65:17–66:01. When he caught sight of Williams, Mitchell walked over to him and asked for a ride, just as he had done with McPhadden. Dkt. 115-6 at 33–35. Williams did not know Mitchell very well, but they had gone to high school together, and Williams had lent him some money a few days earlier. Dkt. 104-1 at 51:22–54:08. Mitchell said that if Williams drove him, Mitchell would pick up a check and pay back Williams. *Id.* at 63:18–25. Williams agreed. *Id.* at 65:19–24. Mitchell got in carrying a red, white, and blue striped shirt under his arm. Dkt. 115-6 at 39:22–25.

The three drove off with Williams driving, Ross in the front passenger seat, and Mitchell in the back seat. Dkt. 104-1 at 65:17–66:01. After dropping Ross off downtown, Williams asked Mitchell where he needed to go. Dkt. 115-6 at 36:08–09. Mitchell answered vaguely, just saying that it was across town. *Id.* at 36:21–25.

Williams did not have his driver's license at that time. Dkt. 104-1 at 61:01–08. Although he was willing to drive without a license in his predominantly Black neighborhood on the east side of town, Williams was scared to drive without a license on the predominantly white west side of town because he thought it was likely that he would get pulled over. Dkt. 104-1 at 61:20–62:04, 66:07–16; Dkt. 115-

4

6 at 62:06–63:09; Dkt. 104-36 at 14:02–23; Dkt. 104-21 at 4. Mitchell had a valid driver's license, however, so when Mitchell said he needed to go across town, the two swapped seats and Williams let Mitchell drive. Dkt. 104-1 at 61:20–62:04, 66:07–16; Dkt. 115-6 at 62:06–63:09.

After driving a while, Mitchell stopped at Cocky's Grocery Store. Dkt. 115-8 at 15:02–15; 19:04–20:16. Lenwood Harley, who was related to Mitchell, was working at Cocky's that day. *Id.* at 15:16–25, 20:17–24. Mitchell went into the store first. *Id.* at 19:04–20:12. He walked up to the counter with the folded-up red and white shirt in his hands. *Id.* at 19:04–20; 21:08–22:13. When he reached the counter, Mitchell unfolded the shirt and pulled out two guns, one silver and one black. *Id.* at 19:04–20, 21:08–10, 23:12–24:06; Dkt. 104-21 at 20. Mitchell pointed the silver gun at Harley and the black gun at Frederick. *Id.* at 19:04–20, 22:19–23:06, 23:12–24:06. He told them it was a robbery. *Id.* at 19:04–20, 22:19–23:06, 23:12–24:06. Harley said it was a tense situation for a few minutes, but it soon de-escalated due to their familial relationship. *Id.* at 25:05–26:08. After a couple minutes, Mitchell wrapped the guns back up in the red, white, and blue striped shirt. *Id.* at 25:05–26:08. The robbery attempt frightened Harley, but Harley knew Mitchell as family, so after Mitchell put the guns away, the two continued to talk. *Id.* at 24:18-27:19. Mitchell told Harley that he was "going to do something" that the "chump" (referring to

5

Williams) did not know about. *Id.* at 27:07–25. Mitchell returned to the car a short while later wearing the red, white, and blue striped shirt. Dkt. 115-6 at 43:18–24.

Mitchell continued driving after the Cocky's incident. Dkt. 115-6 at 44:02–12. Williams kept asking Mitchell, "How much further?", to which Mitchell kept responding, "Not too much." Dkt. 115-6 at 47:01–02; Dkt. 104-1 at 75:20–24. Eventually Mitchell pulled up next to the Wesconnett Produce Store. Dkt. 115-6 at 47:21–48:18. Williams thought this was the store where Mitchell would pick up his check. *Id.* at 48:01–09. Mitchell got out of the car, said he would be back in a few minutes, and went into the store. *Id.* at 48:11–18. Mitchell was still wearing the red, white, and blue striped shirt. *Id.* at 48:22–49:02. Williams sat in his car fiddling with his work helmet, which he had kept in his car because he thought he was going to work on a garbage truck that night. *Id.* at 49:16–50:03.

Inside the store, Mitchell committed the heinous crime at issue in this case: He robbed Kathrina Farah, the owner of the Wesconnett Produce store, and ordered Farah into back of the store, where he shot her three times. Dkt. 115-3 at 152:11–155:14. David Phillips, another customer, happened to go into the Wesconnett Produce Store just as Mitchell was shooting Farah. Dkt. 115-3 at 59:16–23. Phillips heard something but thought it was hammering. *Id.* Phillips grabbed a soft drink from the cooler in the front part of the store. Dkt. 115-3 at 61:04–13. When he turned around, he saw a Black male with a mustache and a goatee and a medium Afro. Dkt.

115-3 at 61:04–13, 73:09–14. That man was Alfred Mitchell. Dkt. 115-6 at 49:06–15. He was holding a silver gun. Dkt. 115-3 at 73:15–19. Mitchell asked Phillips if he had any money. *Id.* at 73:03–07. When Phillips responded yes, Mitchell ordered Phillips into the back storage area where Farah had been shot. *Id.* at 74:07–75:21. Phillips handed over his wallet while the two walked to the back, with Phillips in front facing away from Mitchell. *Id.* Just when Phillips saw Farah on the ground, Mitchell shot him twice in the head. *Id.* at 75:22–76:08.

Mitchell left the store and got back into Williams' car. Dkt. 115-6 at 50:19–51:05. Williams had no idea that Mitchell had just shot two people. *Id.* at 51:14–52:23. Mitchell sped off, hitting a car as he drove away from the store. *Id.* Williams yelled at Mitchell, "What are you doing?!" *Id.* Mitchell responded, "I just killed two people. Don't you be the third." *Id.* Speeding down the road, Mitchell drove erratically, and at some point took off the red, white, and blue striped shirt. *Id.* at 51:14–54:14. A police officer eventually pulled them over. *Id.* Mitchell claimed he was going to shoot the police officer and threatened to shoot Williams, too, if he got out of the car. *Id.* But before any of this happened, Mitchell took off again, leading the police on a chase through the streets of Jacksonville. *Id.* Mitchell drove recklessly until he came to a stop in front of a parked bus. *Id.*; Dkt. 115-4 at 29:08–30:25. At that point, Williams jumped out of the car and ran away from Mitchell. Dkt. 115-6 at 54:15–55:05. Police officers located Williams a short while later and

arrested him. *Id.* Mitchell continued driving until, eventually, he stopped in front of a random house, went inside, and committed suicide. Dkt. 115-4 at 78:04–79:05.

## II.    The Palm Furniture Murder

The Wesconnett Produce Shooting was not the only crime that Mitchell committed. Dkt. 115-11 at 6. About a week prior, Mitchell used *the same silver gun* to rob and kill a man named Tommy Lee Braswell at the Palm Furniture store. *Id.* at 2–6. Similar to Farah and Phillips, Braswell was shot twice in the head. *Id.* at 3–6. In fact, Mitchell admitted to committing the Palm Furniture murder. *Id.* at 6. He said that he would kill himself before he went back to prison. Dkt. 115-12 at 13:07–10.

Defendant D.L. Starling was the lead detective on the Palm Furniture case. *See* Dkt. 115-11 at 2–6 (Palm Furniture police file). Starling concluded that Mitchell had committed the Palm Furniture murder alone after learning about Mitchell's confession, and confirming that the same gun had been used in both the Palm Furniture murder and the Wesconnett Produce store shooting. *Id.* at 6.

## III.    Investigation into the Wesconnett Produce Shooting

Officers from the Jacksonville Sheriff's Office (JSO) responded to the Wesconnett Produce store after the shooting. Dkt. 104-19 at 1–7. Defendant Starling, a homicide detective, was among the first to arrive. Dkt. 104-95 at 19–21. He diagrammed the crime scene in his notes, detailing the layout of the Wesconnett Produce store. *Id.* Among the notes that Defendant Ritchey believed were

8

"probably" written by Starling was a handwritten note documenting that Alfred Mitchell wore a red, white, and blue striped shirt. Dkt. 104-18 at 97:11–18.

Defendant Charles David Ritchey was the lead detective on the Wesconnett Produce shooting. Dkt. 104-17 at 36:04–17. As lead detective, Ritchey was responsible for making sure the case was "properly handled," including ensuring that evidence was properly gather, documented, and disclosed. *Id.* at 36:04–37:08. Ritchey's partner, Defendant Bill Mooneyham, was also involved in nearly everything that Ritchey did. *Id.* at 37:09–15. Ritchey and Mooneyham discussed everything about the case and compared notes at the end of each day. *Id.* at 37:12–15, 193:24–194:06; Dkt. 104-61 at 21:05–22:15. Essentially, Mooneyham knew everything Ritchey did, and vice versa. *See id.*

When Ritchey and Mooneyham arrived at the crime scene on October 8, they spoke with Robert West, who had an office about 150 feet from the Wesconnett Produce store. Dkt. 104-19 at 3–4. West said he had seen two Black males drive up to the Wesconnett Produce store. *Id.* The driver—who wore a red, white, and blue striped shirt—got out of the car and went into the store. *Id.* The passenger, wearing a hard hat, remained in the car. *Id.* After about five or ten minutes, the man who went into the store came back out acting "as if nothing had happened." *Id.* West said that the man got back in the driver's seat and sped away, hitting a car as he drove off. *Id.*

9

Ritchey and Mooneyham also spoke with David Phillips the day of the shooting. *Id.* at 4. Phillips had clear recall of the majority of the incident. *Id.* He told Ritchey and Mooneyham that he thought he heard hammering when he went into the store, and went to the cooler to grab a drink. *Id.* When he turned around, he saw a Black male, "mid 20's, 5'11", thin build, medium length afro, mustache, dark skin, wearing red, white, and blue striped shirt (short sleeve)." *Id.* Phillips said that the man ordered him into the back room, where he was shot. *Id.*

Ritchey and Mooneyham returned to the hospital the next day to show Phillips a photo array. *Id.* at 8. Both Willie Williams' and Alfred Mitchell's photos were included in the photo array. *Id.* Phillips did not identify anyone in the photo array as the shooter. *Id.*

About a week later, Ritchey visited Farah in the hospital, too, after she had stabilized from surgery. *Id.* at 10. Farah told Ritchey that a Black man had approached her counter, pulled out a chrome-plated revolver from his waistband, and robbed her. *Id.* The man then ordered Farah into the back of the store where he shot her. *Id.* Farah said she was "positive" she could identify the man, but when she viewed a physical lineup on December 11, 1975, she did not identify Williams as the shooter. *Id.* at 10, 17. (Mitchell was not included in the lineup due to the fact that he was deceased.) *Id.*

## IV.   Hypnosis Performed on David Phillips

About three weeks after the shooting, Detective Ritchey called David Phillips and asked him to visit the Jacksonville Sheriff's Office. Dkt. 104-17 at 146:06–12. At the office, police officers showed Phillips another photo array, and Phillips again did not identify anyone as the shooter. Dkt. 104-31 at 39:20–40:21; 44:11–45:05. The officers told Phillips that he could not identify the shooter from the photo array because he had a mental block. *Id.* at 40:14–23. Phillips was able to remember most of the details up to the point at which he was shot—including a description of the shooter's face—but he was not able to recall what happened afterward. *Id.* at 40:24-41:06. Detective Ritchey told Phillips that hypnosis might clear up his memory. *Id.* at 44:08-14. Phillips agreed. *Id.* at 45:04–05, 45:12–16.

Detective Ritchey took Phillips into a room and had him sit in a chair. *Id.* at 45:20–24, 82:08–11; Dkt. 104-17 at 128:01–08. Phillips closed his eyes, and Detective Mickler told Phillips to visualize the events of the shooting while Mickler walked him through them. Dkt. 104-31 at 46:20–47:13, 48:11–18, 53:23–54:06. Ritchey recorded the audio of the hypnosis session on a cassette. Dkt. 104-17 at 74:11–23, 89:11–19.

Two or three minutes after the hypnosis session, Detective Ritchey showed Phillips another photo array. Dkt. 104-31 at 49:21-50:07; Dkt. 104-17 at 151:01-14. Phillips then identified Williams as the shooter. Dkt. 104-31 at 50:21–25, 68:13–20.

11

Ritchey did not mention in his police report that he had performed hypnosis on David Phillips. *See* Dkt. 104-19 at 13. The portion of the police report dealing with this identification reads as follows:

> On this date the writer and Lt. Mickler interviewed victim Phillips in the Robbery Office. Victim was unable to remember any additional details of the robbery. Mr. Phillips was shown a spread of (10) color photographs containing both suspects and identified Willie Williams as the one that shot him. Victim's identification from wallet was released to him at this time.

*Id.* Ritchey claimed in his deposition that the prosecutor, Ralph Greene, instructed him not to mention hypnosis in his police report. Dkt. 104-17 at 91:21–92:04. But Ralph Greene denied having any knowledge that hypnosis was performed on David Phillips. Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08. And Ritchey's partner, Bill Mooneyham, testified that he did not recall Greene instructing the officers not to mention hypnosis. Dkt. 104-61 at 34:19–35:23. Mooneyham also testified that Greene was not the sort of prosecutor that would instruct officers to exclude information from a police report. *Id.*

When Ritchey was deposed in Plaintiff's criminal case, he minimized Mickler's role in the case and did not mention that Mickler had performed hypnosis. *See* Dkt. 104-93 at 27:18–24. When Ritchey was asked, "Do you know what Lieutenant Mickler's investigation involved in this case?", he said only that Lieutenant Mickler was present the last time photographs were shown in the office. *Id.* Ritchey omitted that Mickler had performed hypnosis on Phillips three minutes

12

before the photographs were shown. *Id.* In his deposition in this civil case, Ritchey admitted this was a misleading and incomplete answer. Dkt. 104-17 at 163:12–21, 164:12–14, 166:16–19.

Ralph Greene denied having any knowledge that hypnosis was performed in this case. Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08. He testified that if he had known about the hypnosis, he would have disclosed it to Williams' defense attorney because Greene "would have considered it to be potentially exculpatory evidence." Dkt. 104-51 at 6:01–05.

Bill White, Williams' defense attorney, also never learned that hypnosis had been performed on David Phillips. Dkt. 104-36 at 21:09–22. White never received a copy of the audio recording of the hypnosis session that Ritchey created, *id.* at 21:19–22, and when White asked Ritchey about Mickler's involvement in Ritchey's deposition, White received the misleading and incomplete answer described above, Dkt. 104-93 at 27:18–24. White never received this evidence despite submitting a demand for discovery that requested, among other things, "any material information within the State's possession or control which tends to negate the guilt of the accused as to the offense charged." Dkt. 104-37 at 2.

On February 10, 1976, Williams was convicted of two counts of robbery with possession of a firearm and two counts of attempted murder. Dkt. 115-7 at 2, 150–51. He was sentenced to life imprisonment. *See* Dkt. 115-13.

13

In 2020, the Conviction Integrity Review (CIR) unit in the State Attorney's Office for the Fourth Judicial Circuit of Florida began investigating Willie Williams' case. Dkt. 104-67 at 40:25–41:01. The CIR conducted an extensive review of Williams' case and found that a *Brady* violation had occurred. *See* Dkt. 104-34. The CIR found that the government did not disclose to Williams' defense counsel that hypnosis had been performed on David Phillips, and given that Williams' defense theory at trial was misidentification, "the failure to disclose information that undermined the very premise upon which the identification of Williams was made was prejudicial to the defense." Dkt. 104-34 at 11.

Based on the CIR's findings, the state did not oppose Williams' Motion for Postconviction Relief. *See* Dkt. 115-14; Dkt. 104-67 at 25:01–04. On January 3, 2024, Williams' conviction was vacated. *Id.*

## LEGAL STANDARD

A party seeking summary judgment must "identify[] each claim ... on which summary judgment is sought." Fed. R. Civ. P. 56(a). For the specific claims on which a moving party seeks summary judgment, the motion will be granted only if there are no genuine disputes of material facts. Fed. R. Civ. P. 56(a); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001). When determining whether a factual dispute exists, a court must draw all facts and reasonable inferences in favor of the non-moving party. *Id.* A fact is "material" when it might affect the outcome

14

of the case, and a dispute is "genuine" if it could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobb, Inc.*, 477 U.S. 242, 248 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

Defendants do not argue that material facts remain in dispute as to Plaintiff's fabrication of evidence and destruction of evidence claim. Therefore, both of those claims will go to trial against the Individual Defendants, and Plaintiff's fabrication of evidence claim will also go to trial against the City of Jacksonville.[2] Additionally, Plaintiff's conspiracy claim will go to trial against the Individual Officers at least insofar as it rests upon the fabrication of evidence and destruction of evidence.

Material factual disputes preclude summary judgment on the rest of the claims. Factual disputes pervade Plaintiff's *Brady* claim, § 1983 conspiracy claim, § 1983 malicious prosecution claim, and state-law tort claims. These factual disputes preclude summary judgment on these claims.[3]

### I.    Defendant Ritchey is Not Entitled to Summary Judgment on Plaintiff's *Brady* Claim.

To succeed on his § 1983 *Brady* claim against the Individual Defendants at trial, Plaintiff will have to prove that Defendants withheld favorable exculpatory or

---

[2] Plaintiff does not seek to hold the City of Jacksonville liable for its officers destruction of evidence pursuant to a *Monell* theory of liability.

[3] Plaintiff does not intend to pursue his failure to intervene claim at trial.

impeachment from the prosecutor, Ralph Greene, and that prejudice ensued from this suppression. *McMillian v. Johnson*, 88 F.3d 154, 1566-70 (11th Cir. 1996); *Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Defendants withheld two categories of evidence from the prosecutor. First, Defendants withheld evidence that hypnosis was performed on David Phillips. Defendants' summary judgment motion on this issue is quite narrow. Defendants do not dispute that the Individual Defendants acted with the requisite mens rea, or that the hypnosis evidence qualified as *Brady* evidence, or that Plaintiff's defense counsel never obtained the hypnosis evidence. Defendants argue only that they discharged their obligation to turn over the hypnosis evidence to the prosecutor, and that the hypnosis evidence was not "material" to Plaintiff's criminal trial. Both arguments fail. The first argument fails because Defendants refuse to acknowledge Greene's deposition testimony in which he disclaimed any knowledge that hypnosis was performed. The second argument fails because the Supreme Court has consistently held that evidence capable of impeaching a key government witness is "material" for purposes of *Brady*. Phillips was the most important witness in Plaintiff's case; his testimony was the *only* direct evidence identifying Plaintiff as the shooter. Under Supreme Court precedent, evidence that could have impeached Phillips' credibility was material to Plaintiff's trial. Additionally, because the materiality of suppressed evidence must be evaluated cumulatively, the combination

16

of the hypnosis evidence *and* the exculpatory handwritten note put the materiality of suppressed evidence beyond doubt.

Second, Defendants suppressed exculpatory evidence that a police officer at the crime scene documented that Alfred Mitchell was wearing the red, white, and blue striped shirt that everyone agrees the shooter wore. Defendants did *not* move for summary judgment on this component of Plaintiff's *Brady* claim, despite ample notice that Plaintiff intended to rely upon it at trial, and so Plaintiff's *Brady* claim will proceed regardless of how this Court resolves the hypnosis evidence.

### A. Defendant Ritchey Is Not Entitled to Summary Judgment on Plaintiff's *Brady* Claim.

Defendant Ritchey, as the lead detective responsible for disclosing evidence to the prosecutor, Dkt. 104-17 at 36:04–37:08, is not entitled to summary judgment on Plaintiff's *Brady* claims. Facts remain in dispute as to whether Ritchey disclosed to Ralph Greene that hypnosis had been performed on David Phillips, and Defendants do not even argue they are entitled to summary judgment on the exculpatory handwritten note that was suppressed.

#### a. Factual Disputes Remain as to Whether Defendants Disclosed the Hypnosis Evidence to the Prosecutor.

*First*, Defendants contend that Defendant Ritchey disclosed to the prosecutor, Ralph Greene, that hypnosis had been performed on David Phillips. Dkt. 109 at 13. This argument blatantly ignores that Greene denied knowing that Phillips had been

17

hypnotized. Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08. Because material facts remain in dispute, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Defendants discount Greene's testimony, arguing that Greene has limited memory of this case. That argument is factually incorrect. At his deposition, Greene provided a detailed recounting of Plaintiff's criminal prosecution, recalling specific details about the crime, prosecution strategy, and trial. Dkt. 104-50 at 81:25–83:02, 89:15–96:15. Greene has a clear memory of Plaintiff's criminal case and Defendants are not entitled to discredit Greene's testimony by claiming that his memory is imperfect. Defendants are essentially asking this Court to believe Ritchey's testimony instead of Greene's. But that is in direct contravention of the summary judgment standard, which instructs that facts and reasonable inferences be reviewed in the light most favorable to Plaintiff. *Pennington*, 261 F.3d at 1265.

Moreover, other evidence tends to support the truth of Greene's testimony. Ritchey's partner, Defendant Bill Mooneyham—who according to Ritchey himself knew pretty much everything about the case that Ritchey knew, Dkt. 104-17 at 37:12-15, 193:24-194:06—testified that he did not recall Greene instructing the officers not to mention hypnosis. Dkt. 104-61 at 34:19–35:23. Mooneyham also testified that Greene was not the sort of prosecutor that would instruct officers to exclude information from a police report. *Id.*

18

The truth of Greene's testimony is also supported by his contemporaneous practice. Hypnosis was used in another case that Ralph Greene prosecuted around 1978 (a mere two years after Plaintiff was prosecuted), and the fact that hypnosis was used in that case was disclosed to the defense attorney. *See Clark v. State*, 379 So. 2d 372, 373–74 (Fla. 1st DCA 1979); *see* Dkt. 115-15. In accordance with the standard for summary judgment, the inferences to be drawn from this factual dispute should be drawn in Plaintiff's favor, especially given that strong evidence indicates Greene's testimony is true.[4]

*Second*, assuming that Defendant Ritchey did not tell Green that hypnosis had been performed, Defendants contend that they still cannot be held liable for suppressing the hypnosis evidence because Greene should have discovered that evidence himself. This argument contravenes precedent and would yield absurd results if accepted.

Defendants misrepresent the import of a sentence from *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). *Kyles* was a habeas case in which the Supreme Court confirmed that a criminal defendant's due process rights can be violated when police

---

[4] Defendants' argument that they acted on the advice of counsel is meritless. That argument ignores the factual dispute that Greene denied having any knowledge of hypnosis, which is discussed above. The summary judgment standard, which demands that factual inferences be drawn in Plaintiff's favor, precludes summary judgment on this ground. More fundamentally, the very case that Defendants cite in support of this proposition rejects the argument. *Crowe v. Lucas*, 595 F.2d 985, 992 (5th Cir. 1979) ("Reliance on advice of counsel does not serve as an absolute defense to a civil rights action.").

19

officers withhold *Brady* evidence from a prosecutor. *Id.* at 438. The Supreme Court explained that a prosecutor has a duty to gauge the cumulative materiality of all suppressed evidence, so when doing that cumulative analysis, *all* suppressed evidence must be considered regardless whether the prosecutor knew about the suppression or not. *Id.* at 437–38. The Supreme Court never intimated in *Kyles* or any other case that police officers are immunized from civil liability for *Brady* violations, and Defendants misrepresent the holding of *Kyles* by suggesting so.

Indeed, the Eleventh Circuit has held that police officers can be held civilly liable when they intentionally withhold *Brady* evidence from prosecutors. *McMillian v. Johnson*, 88 F.3d 1554, 1568 (11th Cir. 1996) (rejecting police officer's argument that the prosecutor was aware of undisclosed *Brady* evidence because the police officer had conspired to withhold the evidence from prosecutors); *see also Porter v. White*, 483 F.3d 1294, 1308 (11th Cir. 2007) (holding that police officers can be held liable where they intentionally, and perhaps recklessly, withhold evidence from prosecutors). Accepting Defendants' argument would effectively disregard and overturn these cases. This Court should not accept that invitation, especially because the lone citation offered by Defendants to support their argument is taken out of context.

The facts of this case demonstrate the extremity of Defendants' argument. In his deposition for this civil case, Defendant Ritchey admitted that he provided a

20

misleading answer at his deposition in the criminal case as to whether hypnosis was performed. Dkt. 104-18 at 166:16–19. Greene, who was present at Ritchey's deposition in the criminal case, testified that he would have corrected Ritchey's testimony at that deposition if he had known about the hypnosis. Dkt. 104-51 at 3:14–4:13. But Greene made no such correction, which further confirms Greene's lack of knowledge. It is untenable for Defendants to expect prosecutors to uncover evidence that police officers conceal when police officers intentionally mislead the prosecutor about the existence of that evidence. This absurd logic would effectively grant police officers absolute immunity from facing liability for *Brady* violations. No court has accepted that premise, and it should not gain traction here.

    **b. Defendant Ritchey Suppressed a Handwritten Note Attributing the Red, White, and Blue Striped Shirt Worn by the Shooter to Alfred Mitchell.**

In discovery, Defendants produced many pages of handwritten police notes documenting details about the Wesconnett Produce shooting. Most relevant for this case is the note shown below, which appeared amongst other notes that included a diagram of the crime scene, interviews with witnesses, and descriptions of the suspects. *See* Dkt. 115-16.

21



Dkt. 115-16 at 12. This handwritten note documents that "Mitchell" wore the red, white, and blue striped shirt worn by the shooter, while "Williams" wore a navy blue shirt with flowers on it.

This note has obvious exculpatory value. Police reports documented that the shooter wore a red, white, and blue striped shirt. Dkt. 104-19 at 1, 3, 4. So a police officer's contemporaneous documentation that Mitchell was wearing the red, white, and blue striped shirt would tend to prove that Plaintiff was not the shooter. However, this note was not disclosed to the prosecutor or Plaintiff's defense counsel. Dkt. 104-51 at 30:18–31:13; Dkt. 115-17.

The note was not disclosed because Defendants suppressed it. Defendant Ritchey testified the note was "probably" written by Starling when he arrived at the crime scene. Dkt. 104-18 at 97:11–18. Ritchey is likely correct, given that Starling testified he diagrammed the Wesconnett Produce scene and a hand-drawn diagram is found amongst the notes in which the exculpatory evidence is found, *see* Dkt. 104-

22

95 at 19–20 (Starling testimony); Dkt. 115-16 at 4 (hand-drawn diagram); the exculpatory note was found in the police case file for the Palm Furniture murder and Starling was the lead detective on that case, Dkt. 115-18 at 4–5; Dkt. 104-18 at 90:13–14; and Defendant Ritchey testified that the exculpatory note was most likely written by a homicide detective because they were the only detectives who drew diagrams, and Starling was a homicide detective in 1975, Dkt. 104-18 at 93:06–14, 97:11–18.

Defendant Ritchey testified that he would have received this note because homicide detectives gave him any notes they took. Dkt. 104-17 at 48:23–49:16; Dkt. 104-18 at 90:13–18; 94:21–95:22. Despite receiving it, Defendant Ritchey did not disclose the note. Nothing contained in the contents of the note—i.e., the information that tended to exculpate Plaintiff—appears in Ritchey's police report. *See* Dkt. 104-19. And its contents were not divulged in any other manner. *See* Dkt. 104-51 at 30:18–31:13; Dkt. 115-17.

**B. The Suppressed *Brady* Evidence had a "Material" Effect on Williams' Criminal Trial.**

The suppressed *Brady* evidence—evidence relating to the hypnosis performed on David Phillips (including the audio recording) and the handwritten note—had a material causation effect on Plaintiff's criminal trial.

Suppressed exculpatory or impeachment evidence is "material" for *Brady* purposes when there is a "reasonable probability" that the trial would have ended

differently if the evidence had been disclosed. *Kyles*, 514 U.S. at 435 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). This is a lower standard than preponderance of the evidence. Plaintiff does not bear the burden of showing there was insufficient evidence to convict him. *Banks*, 540 U.S. at 698–99 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." (quoting *Kyles*, 514 U.S. at 434–35)). Plaintiff need only show there is a "reasonable probability" that disclosure of the suppressed evidence would have yielded a "different result" at trial. *Kyles*, 514 U.S. at 434. This showing is made when the suppressed evidence "undermines confidence in the outcome of the trial." *Id.* (quoting *Bagley*, 473 U.S. at 678). And when assessing the "materiality" of withheld evidence, evidence must be considered collectively, not item by item. *Id.* at 436.

The Supreme Court has consistently held that non-cumulative impeachment evidence related to a key government witness is "material" for *Brady* purposes when it is suppressed. Just last term, in *Glossip v. Oklahoma*, the Supreme Court held that *Brady* evidence that could have been used to impeach the only witness who identified the criminal defendant as the perpetrator was "material" because "the jury's assessment" of the witness's credibility "was necessarily determinative" to the outcome of the case." 604 U.S. 226, 248 (2025). Similarly, in *Banks v. Dretke*, the government suppressed evidence that a "crucial" government witness was a paid

24

informant. 540 U.S. 668, 699–702 (2004). The Court found that if the evidence had been disclosed, there was a "reasonable probability" that the jury would have imposed a different sentence. *Id.* at 702–03. And finally, in *Giglio v. United States*, the fact that the government failed to disclose a prosecutor had promised immunity to its "key witness" was deemed material because the witness's credibility was an "important issue" for the jury to consider. 405 U.S. 150, 151, 155 (1972).

Most on-point is *Smith v. Cain*, where an eyewitness identified Juan Smith as the perpetrator. 565 U.S. 73, 74 (2012). This identification "was the *only* evidence" linking Smith to the crime. *Id.* at 76. But the government withheld police reports showing that the eyewitness had difficulty providing a description of the perpetrator when initially asked to provide one. *Id.* at 74–75. Because this evidence could have been used to impeach the credibility of the key eyewitness's identification, and no other "strong" evidence connected Smith to the crime, the Supreme Court found the suppressed police reports to be "material" *Brady* evidence. *Id.* at 76.

The hypnosis evidence in this case falls in line with this line of Supreme Court precedent. The hypnosis evidence would have impeached the credibility of David Phillips' identification, which was the government's most important piece of evidence because it was the *only* direct evidence implicating Plaintiff as the shooter. Dkt. 104-36 at 20:04–21:07. No other evidence showed that Plaintiff was the

shooter, as opposed to an unfortunate bystander who meant only to give Mitchell a ride across town.

The centrality of Phillips' identification to the government's case is demonstrated by the prosecutor's reliance on it. In his opening argument, Greene contended that Phillips "will say there is no doubt in his mind" that Plaintiff was the shooter. Dkt. 115-3 at 22:09–17. Greene doubled down on this point in his closing argument, stressing the reliability of Phillips' identification. According to Greene, "[t]here wasn't any doubt about it at all in [Phillips'] mind." Dkt. 115-7 at 41:06–07. Greene urged the jury to "rely on the testimony which goes to the heart of the matter in this case, the testimony of David Phillips who is believable, is a humble, hard working man and I think you will have an abiding conviction the man is guilty and I ask you to return a verdict of guilty as charged." Dkt. 115-7 at 08–15. And Greene told the jury that Phillips would never forget the face of the man who shot him. Dkt. 115-7 at 93:16–20.

Bill White (Plaintiff's defense counsel) testified that if the hypnosis evidence had been disclosed, he would have impeached the credibility of Phillips' identification. Dkt. 104-36 at 33:19–34:04, 35:24–36:15, 37:23–38:09. Even at the time of Plaintiff's trial in 1976, there was significant doubt about the reliability of testimony procured through hypnosis. *E.g.*, *Rodriguez v. State*, 327 So. 2d 903 (Fla. 3rd Dist. Ct. App. 1976) (excluding hypnotically refreshed testimony because the

26

court was "unconvinced of the reliability of statements procured by way of hypnosis"); *Shockey v. State*, 338 So. 2d 33, 37 (Fla. 3rd Dist. Ct. App. 1976) (same). Bill White testified that he would have hired an expert to opine on the admissibility and suggestibility of hypnosis. Dkt. 104-36 at 33:19–34:04, 35:24–36:15. White would have moved to strike the admissibility of Phillips' identification because it was procured through an unreliable, unduly suggestive technique. Dkt. 104-36 at 37:01–21. And White testified that he would have impeached Phillips on cross-examination by pointing out that Phillips did not identify Plaintiff until *after* hypnosis had been performed. *Id.* at 37:23–38:09.

However, without the hypnosis evidence, White could do little to impeach the credibility of Phillips' identification. In closing, White argued only that the incident happened quickly and Phillips made a "simple mistake" based on "human error." Dkt. 115-7 at 46:10–20, 73:02–07. But White was unable to argue that Phillips *never* identified Plaintiff through his own memory, and that Phillips' false identification came only after Plaintiff's face was implanted in Phillips' mind through hypnosis. White could not argue that hypnosis—an unreliable technique even by 1976 standards—was the only reason Phillips identified Plaintiff as the shooter. This latter argument, which was foreclosed by suppression of the hypnosis evidence, is entirely different from contending that Phillips was mistaken, and is thus non-cumulative of the impeachment material available to Bill White at the time.

27

No other evidence showed that Plaintiff was the shooter, as opposed to a bystander stuck in the wrong place at the wrong time by giving a ride to Alfred Mitchell.[5] Nobody else identified Plaintiff as the shooter. Plaintiff's presence at the crime scene did not indicate he was the shooter because Plaintiff never intended to go to the Wesconnett Produce store—he ended up there only after Mitchell drove him there. Nor did the blood on Plaintiff's car door incriminate him as the shooter—although Defendants speculate that the blood came from plaintiff, forensic testing was inconclusive as to the source of the blood. Dkt. 104-18 at 66:23–06; Dkt. 104-19 at 16–17. Even Defendant Ritchey admitted in his deposition that he had no evidence that the blood came from Plaintiff, or at what time the blood got onto the car door. Dkt. 104-17 at 29:15–18, 30:18–22; Dkt. 104-18 at 66:23–67:09.

---

[5] Defendants argue the hypnosis evidence was not material because even if Plaintiff was not the shooter, he could have been convicted as a principal. *See* Dkt. 109 at 14. The Supreme Court has rejected such post hoc attempts to retry a criminal defendant under a different legal theory. *See Wearry v. Cain*, 577 U.S. 385, 392-93 (2016) (finding *Brady* evidence to be material even though the criminal defendant could have been, but was not, charged as an accessory to a crime).

Regardless, this argument misconstrues *Brady*'s "materiality" test. Plaintiff does not bear the burden of showing that there was insufficient evidence to convict him. *See Banks*, 540 U.S. at 698-99 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." (quoting *Kyles*, 514 U.S. at 434-435)). Plaintiff need only show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 698 (quotation omitted). Because the prosecutor relied so heavily on Phillips' identification at trial, discussion of the hypnosis evidence at Plaintiff's trial would have fundamentally reshaped the trial by, among other things, impeaching the credibility of the government's key witness. This satisfies the *Brady* materiality standard.

This case falls in line with other cases in which courts have found that evidence of hypnosis being performed on a key government witness is "material" under *Brady* when there is little other direct evidence tying the criminal defendant to the crime. *E.g.*, *Jean v. Rice*, 945 F.2d 82, 87 (4th Cir. 1991) (failure to disclose hypnosis of two key government witnesses was material where the conviction rested "substantially on the witness identifications"); *Sims v. Hyatte*, 914 F.3d 1078, 1091-92 (7th Cir. 2019) (same where the prosecution's case hinged on the identification of a victim who had been hypnotized). In these cases, the fact that the juries never learned that key identifications had been made through the use of hypnosis "undermine[d] confidence in the outcome of the trial," *Smith*, 565 U.S. at 75 (quoting *Kyles*, 514 U.S. at 434), and made the hypnosis evidence material.

Even if there were doubt as to the materiality of the hypnosis evidence, it must be considered collectively alongside the suppressed handwritten note. *See Kyles*, 514 U.S. at 436. Defendants do not even dispute that, collectively, the suppressed evidence is material. The handwritten note provides powerful exculpatory evidence that Mitchell committed the crime (supporting Plaintiff's alibi that he never meant to be involved in this crime), and the hypnosis evidence impeaches the key government witness who identified Plaintiff as the perpetrator. Together, these two pieces of suppressed evidence—which exculpate Plaintiff and cast significant doubt

29

on the reliability of the only testimony inculpating him—collectively "undermine confidence in the outcome of the trial." *Smith*, 565 U.S. at 75.

If the jury had known that police documented Alfred Mitchell wore the red, white, and blue striped shirt worn by the shooter, and David Phillips had identified Plaintiff as the shooter only after hypnosis was performed on him, there is a "reasonable probability" that Plaintiff's trial would have ended differently.

## C. Defendant Ritchey is Not Entitled to Qualified Immunity Because it was Clearly Established in 1976 that Impeachment Evidence Related to a Key Government Witness had to be Disclosed.

Defendant Ritchey is not entitled to qualified immunity because he violated Plaintiff's clearly established *Brady* rights.[6] By 1976, the contours of the *Brady* doctrine were "sufficiently clear such that every reasonable officer" would have understood hypnosis evidence to fall within *Brady*'s purview.[7] *Aguirre v. Seminole Cnty.*, 158 F.4th 1276, 1296 (11th Cir. 2025) (articulating the qualified immunity standard). Thirteen years before Plaintiff's trial, in 1963, the Supreme Court decided *Brady v. Maryland* and clearly established the "broad statement of principle" that a criminal defendant is entitled to receive exculpatory evidence. *Aguirre*, at 1297. The

---

[6] In the qualified immunity section of his brief, Defendant Ritchey again argues that Ralph Greene knew about the hypnosis. Because Greene denies having known about hypnosis, Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08, that factual dispute precludes summary judgment. The fact that the State Attorney's file *might* have other notes discussing Mickler's involvement only deepens this factual dispute, it does not resolve it.

[7] Plaintiff's criminal trial occurred in 1976, and so that is the proper reference point.

30

Supreme Court confirmed in *Giglio v. United States*, 405 U.S. 150, 154 (1972), that *Brady*'s holding applied to impeachment evidence, too.

Any reasonable officer in 1976 would have recognized that evidence relating to the procurement of the *only* inculpatory identification against a criminal defendant through the use of hypnosis would need to be disclosed under *Brady*. Indeed, at his deposition, Defendant Ritchey *admitted* that he withheld *Brady* evidence:

> **Q:** So the question there is: Did you withhold from Plaintiff any exculpatory evidence, right? That's the – the question being asked.
> **A:** Yes.

Dkt. 104-18 at 30:24–31:02. Defendant Ritchey testified that "the defense had a right to know" that Phillips had been hypnotized before identifying Plaintiff as the shooter, and that withholding that information violated Jacksonville Police Department policy. Dkt. 104-18 at 31:20–33:15. Because qualified immunity does not protect officers who "knowingly violate the law," *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation omitted), Defendant Ritchey's admission precludes him from receiving qualified immunity.

Further confirming that a reasonable officer in 1976 would have recognized hypnosis evidence as *Brady* material, Defendant Mooneyham stated that he "absolutely" would have disclosed evidence of hypnosis to the prosecutor and defense counsel. Dkt. 104-61 at 30:24–31:04. Tim Reddish, another officer who worked in the Jacksonville Sheriff's Office in the 1970s, testified that evidence of

31

hypnosis would have been obvious *Brady* material. Dkt. 104-63 at 97:22–98:02.

Ralph Greene confirmed that he likewise would have viewed the hypnosis evidence

as *Brady* evidence. Dkt. 104-51 at 165:01–05. Indeed, Defendants' own expert

attested that any reasonable officer in 1976 would have recognized the hypnosis

evidence as *Brady* evidence that had to be turned over. Dkt. 115-20 at 18–25

(agreeing with Plaintiff's expert's opinion that a "reasonable and prudent law

enforcement officer" in 1976 would have recognized the hypnosis evidence as *Brady*

evidence); *see also* Dkt. 115-21 at 15 (same). As these testimonies show, there is a

consensus among everyone who handled *Brady* evidence in the 1970s that the

hypnosis evidence qualified as *Brady* material. Nobody in this case—not even the

Defendants themselves in their depositions—agree with the argument that it was

unclear whether evidence of hypnosis had to be disclosed in 1976.

Case law confirms that any reasonable officer in 1976 would have recognized

that evidence of hypnosis being performed on the *only* witness to identify a criminal

defendant as the perpetrator would need to be disclosed under *Brady*. Even if the

admissibility of testimony procured through hypnosis was still being debated at the

time, it was beyond doubt that such testimony had serious reliability concerns.

Several courts in Florida and the Fifth Circuit had excluded testimony procured

through hypnosis after finding that it was unreliable. *E.g.*, *Rodriguez v. State*, 327

So. 2d 903 (Fla. 3rd Dist. Ct. App. 1976) (excluding hypnotically refreshed

testimony because the court was "unconvinced of the reliability of statements procured by way of hypnosis"); *Shockey v. State*, 338 So. 2d 33, 37 (Fla. 3rd Dist. Ct. App. 1976); *Emmett v. Ricketts*, 397 F. Supp. 1025 (N.D. Ga. 1975).

In accord with these decisions, courts across the country prior to 1976 excluded statements made under hypnosis due to reliability concerns. *People v. Ebanks*, 117 Cal. 652, 665–66 (Cal. 1897); *Emmett v. State*, 232 Ga. 110 (Ga. 1974) ("We conclude that the reliability of hypnosis has not been established[.]"); *People v. Harper*, 111 Ill. App. 2d 204, 209 (Ill. 1969); *State v. Pusch*, 46 N.W.2d 508 (N.D. 1950); *Jones v. State*, 542 P.2d 1316, 1327 (Okla. 1975); *State v. Harris*, 241 Or. 224, 242 (Or. 1965) (en banc); *State v. Pierce*, 263 S.C. 23 (S.C. 1974); *Greenfield v. Commonwealth*, 214 Va. 710 (1974).

Even in the few jurisdictions where statements made under hypnosis were admitted, courts reasoned that the hypnosis context was fertile ground for cross-examination that could impeach the credibility of the testimony. *Harding v. State*, 5 Md. App. 230, 236 (Md. Court of Appeals 1968); *People v. Leyra*, 302 N.Y. 353, 362 (N.Y. 1951); *State v. Exum*, 50 S.E. 283, 285–86 (N.C. 1905); *Wyller v. Fairchild Hiller Corp.*, 503 F.2d 506, 509–10 (9th Cir. 1974); *Kline v. Ford Motor Co., Inc.*, 523 F.2d 1067, 1069–70 (9th Cir. 1975). These decisions confirm that even if Phillips' identification had been admissible at Plaintiff's trial, any reasonable juror would have had serious doubts about the reliability of that identification. These

33

doubts would have formed solid ground for Plaintiff's counsel to impeach Phillips on cross-examination. And because the hypnosis evidence formed solid grounds for impeachment of the key government witness, any reasonable officer would have known the evidence was *Brady* material.

The unreliability of hypnosis evidence led multiple courts by 1976 to conclude that criminal defendants' *Brady* rights were violated when the government failed to disclose that a key government witness's testimony was the product of hypnosis. *E.g.*, *United States v. Miller*, 411 F.2d 825 (2d Cir. 1969); *Emmett v. Ricketts*, 397 F. Supp. 1025 (N.D. Ga. 1975).

**II.    The Individual Defendants are Not Entitled to Summary Judgment on Plaintiff's Claim that they Conspired to Suppress *Brady* Evidence.**

All Individual Defendants are liable for conspiring to conceal the two pieces of *Brady* evidence that were suppressed. Plaintiff can prove his conspiracy claim under § 1983 by showing that defendants reached an agreement to deny plaintiff his federal rights. *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010). This test does not require Plaintiff to produce a "smoking gun" proving the conspiracy. *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990). At summary judgment, Plaintiff need only set forth enough evidence from which the inference can be drawn that Defendants willfully participated in a mutual "understanding" to suppress *Brady* evidence. *Id.* This agreement can be inferred from the relationship of the parties,

34

their overt acts and concert of action, and the totality of their conduct. *AFL-CIO v. City of Miami*, 637 F.3d 1178, 1192 (11th Cir. 2011).

As explained below, there is sufficient evidence to infer that the Individual Defendants conspired together to suppress *Brady* materials. Defendant Mooneyham was Ritchey's partner and was aware of nearly every action that Ritchey took. Based on this close working relationship, the inference can be drawn that Mooneyham knew and approved of Ritchey concealing *Brady* evidence. As for Defendants Mickler and Starling, both detectives took overt actions to create the withheld *Brady* evidence and participate in the suppression.

Finally, the intracorporate conspiracy doctrine does not bar Plaintiff's § 1983 conspiracy claim for the same reason given by this Court when it denied in part Defendants' motion to dismiss: "Because the alleged conduct involves a criminal conspiracy to violate Mr. William's rights, the intracorporate conspiracy doctrine does not bar his claim." Dkt. 95 at 7 (citing *Grider*, 618 F.3d at 1262). As discussed below, there is ample evidence to conclude that Defendants conspired to violate Plaintiff's *Brady* rights. Indeed, Defendant Ritchey admitted at his deposition that he violated Plaintiff's *Brady* rights. Dkt. 104-18 at 30:24–31:02, 31:20–33:15. Moreover, Defendants do not even dispute that they conspired to violate Plaintiff's Due Process rights when they fabricated evidence against him and destroyed other

potentially exculpatory evidence. It is unclear why Defendants continue to press this argument when this Court has already rejected it.

## A. Conspiracy to Suppress Hypnosis Evidence

Defendants Mooneyham and Mickler conspired with Ritchey to suppress evidence that Mickler had performed hypnosis on David Phillips.

As Ritchey's partner, Defendant Mooneyham maintained a close working relationship with Ritchey, making Mooneyham's knowledge of the case essentially co-extensive with Ritchey's. Defendant Mooneyham testified that he and Ritchey "worked together as a team." Dkt. 104-61 at 20:19–25. They rode together daily and were aware of nearly every action taken by each other. Dkt. 104-61 at 20:05–21:15, 23:15–24:05. Defendant Ritchey confirmed that Mooneyham knew pretty much everything that Ritchey knew about the case. Dkt. 104-17 at 37:12-15, 193:24-194:06. The close working relationship between Mooneyham and Ritchey—and their perpetual discussion of major cases like the Wesconnett Produce shooting—means that Mooneyham almost certainly knew that Mickler had performed hypnosis on David Phillips and that Ritchey was suppressing that information. Mooneyham's knowledge and participation in the investigation made him a willful participant in the conspiracy to suppress evidence of the hypnosis.

Likewise, Mickler was an active participant in the investigation into the Wesconnett Produce shooting. He took an overt action that furthered the conspiracy

36

to suppress *Brady* evidence by performing hypnosis on Phillips. Mickler's active participation in the conspiracy to suppress this evidence is further supported by the fact that his practice in this case departed from his usual course of action. In other cases, Mickler disclosed the fact that he performed hypnosis and explained the method he used to perform hypnosis. For example, in a 1978 prosecution, Mickler performed hypnosis and disclosed that fact. *Clark v. State*, 379 So. 2d 372, 373-74 (1979). He testified as to how he performed hypnosis and that he did not know the facts of the underlying case before performing hypnosis. *Id*. at 374. Similarly, in *Brown v. State*, Mickler performed hypnosis and testified to his procedures. 426 So. 2d 76, 79 (1983). Here, however, Mickler performed hypnosis and never revealed details about how he performed it. Mickler's overt action—performing hypnosis— and his departure from ordinary practice provides sufficient evidence from which the inference can be drawn that he participated in Ritchey's suppression of hypnosis.

### B. Conspiracy to Suppress Exculpatory Handwritten Note

Defendants Starling and Mooneyham conspired with Ritchey to suppress Starling's handwritten note. Recall that Defendant Starling is the most likely author of the handwritten note stating that Alfred Mitchell wore the red, white, and blue striped shirt worn by the shooter. Dkt. 104-18 at 97:11–18. By writing the note, Starling took an overt action in furtherance of the conspiracy to suppress it. *See AFL-CIO*, 637 F.3d at 1192. Starling also worked alongside Ritchey and gave him all

notes taken at the crime scene. Dkt. 104-17 at 48:23–49:16; Dkt. 104-18 at 90:13–18; 94:21–95:22.

Starling also took several other overt actions that suggest he knew Ritchey was suppressing the exculpatory note. Starling gave a deposition in Plaintiff's criminal investigation but never mentioned the fact that he had gathered evidence suggesting that Mitchell wore the red, white, and blue striped shirt worn by the shooter. *See* Dkt. 104-95 at 19–33. Also, after learning that Mitchell had admitted to committing the Palm Furniture murder using *the same gun* used in the Wesconnett Produce shooting, Starling closed the Palm Furniture murder case and determined that Mitchell had committed it by himself. Dkt. 115-11 at 6. Despite concluding that Mitchell had committed a similar crime a few weeks before with the same weapon, Defendant Starling *still* did not disclose in his deposition that he had gathered evidence suggesting that Mitchell had worn the red, white, and striped shirt at the Wesconnett Produce store. These overt actions are sufficient evidence from which to infer that Starling knew that Ritchey was suppressing the exculpatory note, and that Starling approved and took part in that suppression.

For Mooneyham, as discussed above, his close working relationship with Ritchey means that he knew about nearly every action taken by Ritchey. Dkt. 104-61 at 20:05–21:15, 23:15–24:05; *see also* Dkt. 104-17 at 37:12–15, 193:24–194:06. Indeed, Mooneyham testified that he compared notes with Ritchey at the end of each

day. Dkt. 104-61 at 20:05–21:15. Given the significance of Starling's note, it is highly likely that Mooneyham and Ritchey had a conversation about this specific note and reached a mutual understanding to suppress it. Or, at the very least, that conclusion can be inferred from the relationship between Mooneyham and Ritchey and the concert of actions in which they engaged as part of that relationship, which is sufficient to allow Plaintiff's conspiracy claim to proceed to trial. *See AFL-CIO*, 637 F.3d at 1192.

### C. The Individual Defendants are Not Entitled to Qualified Immunity Because it was Clearly Established in 1976 that Officials Could not Conspire to Violate an Individual's Constitutional Rights.

Although they argue that they are entitled to qualified immunity on Plaintiff's *Brady* claim, the Individual Defendants do not argue that they are entitled to qualified immunity on Plaintiff's conspiracy claim. *See, e.g.*, Dkt. 106 at 23-25 (arguing only for qualified immunity on *Brady* claim). That is for good reason. It should be obvious that government officials cannot conspire to deprive an individual of his constitutional rights. *See Gilmore v. Georgia Dep't of Corrs.*, 144 F.4th 1246, 1258 (11th Cir. 2025) (explaining that officials are not entitled to qualified immunity for "obvious" constitutional violations). But even if not obvious, by 1976, it was well established that governmental officials could be held liable for conspiring to deprive an individual of his constitutional rights. In *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152–53 (1970), the Supreme Court made it clear that a conspiracy to

39

violate constitutional rights is unlawful. The Eleventh Circuit has recognized the binding effect of *Adickes*'s holding for purposes of qualified immunity. *Strength v. Hubert*, 854 F.2d 421, 425 (11th Cir. 1988) (citing *Adickes*).

### III. Factual Disputes Preclude Summary Judgment on Plaintiff's State-Law Conspiracy Claim.

The same evidence cited above regarding Plaintiff's § 1983 claim also precludes summary judgment on Plaintiff's state-law conspiracy claim. To succeed on his state-law claim, Plaintiff must show (1) a conspiracy between two or more parties, (2) to do an unlawful act, (3) the doing of some overt act in pursuance of the conspiracy, and (3) damage to plaintiff as a result of the acts performed pursuant to the conspiracy. *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. 5th DCA 2006). Each of these elements is met by the evidence cited above. Each of the Defendants took an overt action to jointly commit an unlawful act of withholding *Brady* evidence—Starling documented the handwritten note; Mickler performed hypnosis; Ritchey suppressed both pieces of *Brady* evidence; and Mooneyham knew about the suppression and participated in it. As a result, Plaintiff was wrongfully convicted and spent nearly 45 years in prison for a crime he did not commit.

### IV. Factual Disputes Preclude Summary Judgment on Plaintiff's § 1983 and State-Law Malicious Prosecution Claims.

Defendants completely ignore the suppression of the exculpatory handwritten note in arguing for summary judgment on Plaintiff's malicious prosecution claims.

40

But key facts remain in dispute as to whether Defendants Starling, Ritchey, and Mooneyham caused Plaintiff to be prosecuted without probable cause by suppressing this exculpatory information. To succeed on his § 1983 malicious prosecution claim at trial, Plaintiff must prove three elements: (1) The criminal proceedings were initiated without probable cause; (2) Defendants had a malicious motive in instituting the criminal proceedings, which can be satisfied by showing that the proceedings were initiated without probable cause; and (3) the criminal proceedings terminated in Plaintiff's favor.[8] Defendants dispute only the first element, arguing that there was probable cause to prosecute Plaintiff.

There is a factual dispute as to whether Defendants knew about exculpatory information that would have vitiated the probable cause finding. The handwritten note—likely written by Defendant Starling—indicates that Mitchell wore the red, white, and blue striped shirt worn by the shooter. Dkt. 115-16 at 12. Defendant Starling testified that he took his notes (including the crime scene diagram found in the same packet of notes as the exculpatory note) on the day of the shooting. Dkt. 104-95 at 19–20. Which means there is a factual dispute as to whether Defendant Starling knew about evidence exculpating Plaintiff from the shooting for which he

---

[8] A malicious prosecution claim under Florida state law is distinct from its federal analogue and has different legal elements. *See Miami-Dade Cnty. v. Asad*, 78 So. 3d 660, 664 (Fla. 3d DCA 2012). The two should not be conflated. However, because Defendants dispute only whether probable cause existed for Plaintiff's prosecution, the same arguments precluding summary judgment on Plaintiff's § 1983 malicious prosecution claim also preclude summary judgment on Plaintiff's state-law malicious prosecution claim.

was charged but nevertheless suppressed that evidence. And because Starling gave all his notes to Ritchey, Dkt. 104-17 at 48:23–49:16; Dkt. 104-18 at 90:13–18; 94:21–95:22, there is a factual question as to whether Ritchey (who was responsible for disclosing exculpatory information) intentionally suppressed this handwritten note in order to prevent it from impairing the prosecutor's probable cause finding.

Because "the legal process justifying [Plaintiff's] seizure was defective due to constitutional infirmities"—namely, the withholding of exculpatory information from the prosecutor—Defendants are not entitled to summary judgment on Plaintiff's malicious prosecution claim. *Aguirre*, 158 F.4th at 1301.

Additionally, the information charging Plaintiff contended that he robbed and shot Kathrina Farah and David Phillips. *See* Dkt. 115-22 at 5–6. There was no additional factual basis presented to charge Plaintiff for the crimes. Defendants cannot "rehabilitate" the faulty charging document with new evidence missing from the original document. *Sylvester v. Fulton Cnty. Jail*, 94 F.4th 1324, 1330 (11th Cir. 2024). Therefore, all the evidence cited by Defendants—including Plaintiff's presence outside the crime scene, Plaintiff's statements, and blood found in Plaintiff's car—cannot be considered for this claim. *Id.* at 1330.

## V.   Factual Disputes Preclude Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim.

Defendants' only argument for summary judgment on Plaintiff's intentional infliction of emotional distress (IIED) claim is that the Individual Defendants did

not withhold *Brady* evidence, or in the alternative, that the Individual Defendants were relying on advice from counsel (presumably, Ralph Greene). Dkt. 109 at 23. Those arguments fail because they ignore Ralph Greene's testimony that he never knew about the hypnosis performed on David Phillips. Dkt. 104-50 at 155:03–14; Dkt. 104-51 at 5:10–7:22; 16:23–17:14; 20:25–21:08. Because Defendants refuse to acknowledge material factual disputes, and improperly take inferences in their favor, summary judgment must be denied. *Hallums v. Infinity Ins. Co.*, 945 F.3d 1144, 1148 (11th Cir. 2019).

Intentionally framing someone for a crime they did not commit, and causing them to spend nearly 45 years in prison, is the sort of misconduct that is "outrageous" and goes "beyond all bounds of decency." *Deauville Hotel Mgmt., LLC v. Ward*, 219 So. 3d 949, 954 (Fla. 3rd DCA 2017).

## VI. None of the Defendants are Entitled to Summary Judgment on Plaintiff's Fabrication of Evidence Claim.

There are factual issues in dispute as to whether Defendants intentionally fabricated David Phillips' false identification by hypnotizing him after he repeatedly said that Plaintiff was not the man who shot him. In recognition of these remaining factual disputes, none of the Defendants—not the four individual Defendants, nor the City of Jacksonville—moved for summary judgment on Plaintiff's fabrication of evidence claim. This claim will proceed to trial. *See* Fed. R. Civ. P. 56(a) (requiring parties moving for summary judgment to "identify[] each claim or defense … on

which summary judgment is sought"); *Gentry v. Harborage Cottages-Stuart, LLP*, 654 F.3d 1247, 1261 (11th Cir. 2011) (explaining that failure to identify a claim on which summary judgment is sought precludes granting summary judgment on that argument).

Plaintiff's Second Amended Complaint put the individual Defendants on notice that he was pleading a fabrication of evidence claim. Plaintiff alleged that "Defendants built an entirely false case against Mr. Williams by fabricating evidence, including the false inculpatory testimony by Phillips and police reports." Dkt. 67 ¶ 9. Plaintiff specifically alleged that Phillips' identification, as well as the police reports documenting it, were false and fabricated evidence. *Id.* ¶ 9, 69, 80. Indeed, this Court recognized Plaintiff's fabrication-of-evidence claim when denying in part Defendants' motion to dismiss. Dkt. 95 at 1 ("Defendants fabricated the evidence upon which that conviction rested."). Material facts remain in dispute on this claim. *E.g.*, Dkt. 104-18 at 121:18–123:22 (Ritchey admitting that he intentionally did not mention hypnosis in his police report, and also raising the factual dispute as to the prosecutor's knowledge of that fact).

The Individual Defendants are also not entitled to qualified immunity because it is "an affirmative defense that must be pleaded by a defendant official," *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982). Regardless, it has been clearly established since *Napue v. Illinois* that "'a conviction obtained through use of false evidence,

44

known to be such by representatives of the State,' is tainted so as to violate the mandate of the Fourteenth Amendment." *Aguirre*, 158 F.4th 1276, 1298 (11th Cir. 2025) (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)).

For the similar reasons, the City of Jacksonville is also not entitled to summary judgment on Plaintiff's fabrication of evidence claim because it did not move for summary judgment on Plaintiff's fabrication of evidence claim. *See* Dkt. 105 at 19-22 (arguing for summary judgment only on Plaintiff's *Brady* claim). Plaintiff also gave the City of Jacksonville notice that he was seeking to hold the City liable for its officers' misconduct through *Monell* liability. The Second Amended Complaint alleged that the evidence fabrication in this case was "undertaken pursuant to the policies and practices" of the City of Jacksonville. *Id.* ¶ 110. Plaintiff alleged that the City did not maintain adequate policies on conducting lineups or writing police reports, *id.* ¶¶ 111–113, and failed to provide adequate training on these topics, *id.* ¶ 117. Additionally, Plaintiff alleged that the City of Jacksonville failed to supervise and/or discipline officers who fabricated evidence. *Id.* ¶ 122. In sum, Plaintiff alleged that the City's policies and practices—or, the lack thereof—were a moving force behind the fabricated evidence in this case. *Id.* ¶¶ 124–126.

Regardless, even if the City had moved for summary judgment on Plaintiff's fabrication of evidence claim, Defendants have not carried their initial burden of showing there is no genuine issues of material fact on Plaintiff's *Monell* theory. *See*

*Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (explaining that the moving party bears the initial burden). Fabricating evidence poses such an "obvious" risk for violating constitutional rights that the City's lack of policies and training on the issue demonstrates deliberate indifference to the risk. *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

There are factual disputes remain about the City's policies and practices on fabricating evidence. Defendant Ritchey testified that his supervisor *approved* fabricating the police report by omitting mention of hypnosis from it. Dkt. 191:03–07 (Defendant Ritchey admitting that his sergeant "approved the decision to remove any mention of hypnosis in the report."). Even a Lieutenant in the robbery office might have known about the fabricated police report. Dkt. 104-17 at 193:02–23 (Ritchey testifying that Lieutenant Fred Grey might have been involved in the hypnosis cover-up). While Ritchey may have also testified about his general practice for taking notes, that testimony does not negate the fact that he willfully fabricated the police report in this case and that his supervisors approved his fabrication. The pervasive knowledge and approval of fabricated evidence demonstrates that the Jacksonville Sheriff's Office in 1975 did not have adequate policies or training to address the obvious risk to constitutional violations posed by fabrication of evidence.

Because none of the Defendants moved for summary judgment on this claim, it will proceed against the four Individual Defendants and the City of Jacksonville.

46

Additionally, Plaintiff's conspiracy claims will proceed against the Individual Defendants because Defendants did not seek summary judgment on those claims as they relate to fabrication of evidence.

## VII.    None of the Defendants are Entitled to Summary Judgment on Plaintiff's Destruction of Evidence Claim.

Defendants also did not move for summary judgment on Plaintiff's destruction of evidence claim and therefore are not entitled to summary judgment on that claim, either. *Gentry*, 654 F.3d at 1261. Plaintiff's Second Amended Complaint put Defendants on notice that he was pleading a destruction of evidence claim. Plaintiff alleged that the Individual Defendants "agreed to destroy the audio recording and any notes of Defendant Mickler's hypnosis session with Phillips to ensure Mr. Williams's conviction." Dkt. 67 ¶ 73; *see also* ¶¶ 8, 82, 131, 132. In fact, this Court recognized that Plaintiff pleaded a destruction-of-evidence claim when it denied in part Defendants' motion to dismiss. Dkt. 95 at 2 ("Defendants went as far to destroy a recording of the witness's hypnosis and police reports to prevent their disclosure to Mr. William's defense team and the prosecution team.").

Because the Defendants moved for summary judgment on this claim, it will proceed against the four Individual Defendants.[9] Additionally, Plaintiff's conspiracy

---

[9] Plaintiff does not seek to hold the City of Jacksonville liable for its officers' destruction of evidence pursuant to a *Monell* theory of liability.

claims will proceed against the Individual Defendants because Defendants did not

seek summary judgment on those claims as they relate to destruction of evidence.


Dated: December 5, 2025

<div style="margin-left:40%">

Respectfully submitted,

/s/ Justin Hill
*One of Plaintiff's Attorneys*

Jon Loevy*
Justin Hill* IL #6342031
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
Telephone: (312) 243-5900
jon@loevy.com
hill@loevy.com
**Attorneys for Plaintiff**
*\*Admitted Pro Hac Vice*

Jonathan Picard, Fl. #105477
Human Rights Defense Center
P.O. Box 1151
Lake Worth, FL 33460
Telephone: (802) 233-2545
jpicard@humanrightsdefensecenter.org
**Attorneys for Plaintiff**

</div>

## <u>CERTIFICATE OF SERVICE</u>

I, Justin Hill, an attorney, hereby certify that on December 5, 2025, I caused

a copy of the foregoing to be served on all counsel of record via the CM/ECF Court

Filing system.


<u>/s/ Justin Hill</u>
*One of Plaintiff's Attorneys*